ARTHUR WIESENBERGER, Appellant, *v.* LAWRENCE S. MAYERS et al., Respondents.

First Department, December 16, 1952.

*John W. Davis* of counsel (*William R. Meagher* and *Joseph Lotterman* with him on the brief; *Lotterman & Tepper,* attorneys), for appellant.

*Simon H. Rifkind* of counsel (*Maurice Finkelstein, Joseph S. Iseman, Edward N. Costikyan* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for Lawrence S. Mayers and another, respondents.

*Maurice Finkelstein,* attorney for Chauncey M. Mayers and another, respondents.

VAN VOORHIS, J. Plaintiff appeals from a summary judgment dismissing the complaint in an action for brokerage commissions claimed to be payable for procuring a purchaser of corporate stock. Plaintiff's terms of employment were expressed in the form of a letter addressed to defendants Lawrence and Chauncey Mayers, which they approved in writing, and which reads as follows:

" This will serve as the memorandum which you requested of what we previously agreed upon orally regarding the sale of all of the outstanding stock of L. & C. Mayers Co., Inc., which I understand is owned by your wives and yourselves.

" As I explained, it takes time to negotiate a sale because first, considerable preparatory work is required before a proper presentation can be made to a prospective buyer, and, second, it takes time for a buyer to decide whether or not to buy. Accordingly, you now give me the exclusive right until August 31, 1950 to sell the above stock. The price is $2,500,000 for all the shares, payable in cash, or upon such other terms as may be acceptable to you. For my efforts in procuring a purchaser by that date, you will pay me $100,000 upon completion of the transaction. Of course, if I do not obtain a purchaser by that date, you will owe me nothing, regardless of my efforts and expense— and it follows also that should I obtain a purchaser by that date, but the transaction should perchance close thereafter, my commission nonetheless will have been earned.

" Because the deal is capable of being worked out in different ways, our understanding is that I am to receive my commission no matter what kind of assets you actually sell or in what form the transaction is cast.

" I believe this covers our understanding completely, and, if you agree, kindly sign the enclosed copy of this letter and return it to me."

Construing the facts stated in the affidavits most favorably to appellant, it appears that he procured no prospective purchaser of respondents' stock for $2,500,000, that the price was reduced to $2,170,000 in cash and 12,500 shares of stock in the purchasing corporation worth approximately $134,000 (making a total proposed purchase price of $2,304,000), that no definitive agreement was ever made for the sale of the stock except a written contract signed August 4, 1950, which contained an escape clause expressly allowing the purchaser or the sellers to withdraw unconditionally at the election of either, that no sale was executed at any price nor was any executory agreement concluded which obligated defendants to sell or the prospective purchaser to buy.

The basis on which plaintiff claims to have earned the commission is that after the services which he rendered had been completed without producing a purchaser willing to pay the price asked by the sellers, the latter reduced their demands to what the prospective purchaser was willing to pay, but thereafter changed their minds and declined to sell. It has been conceded that there never was a binding contract compelling defendants to sell. · It is not contended that plaintiff did anything tending to bring the parties together after defendants are claimed to have lowered their demands to the purchaser's level. Recovery is sought upon the basis that defendants said " yes " to the offer that was presented at less than the original terms, but then said " no " before a sale had been made or incorporated into an executory contract. Assuming, without deciding, that such facts alone would be sufficient in law to support a recovery, additional facts uphold the dismissal of the complaint by Special Term. These additional facts are narrated briefly, resolving any conflicting statements in the affidavits in favor of plaintiff.

On August 2, 1950, defendants Lawrence and Chauncey Mayers, in company with plaintiff, met with a representative of the prospective purchaser, Nathan Straus-Duparquet, Inc. The purchaser's representative announced that a loan, which was a necessary condition of the transaction, had been approved, and that upon the consummation of this loan the purchaser would be ready to buy defendants' stock for the consideration hereinbefore mentioned, to wit: $2,170,000 in cash and 12,500 shares of stock in the purchasing corporation. Later that afternoon they met again, and, according to plaintiff's affidavit: " It was then agreed that the agreement of sale would be finalized by counsel for the parties and executed within the next day or two, and

that the agreement, when executed, would be held by Mr. Goldwater in escrow pending the successful conclusion of the loan negotiations, which Straus expected would take place within a few days thereafter.''

On August 4, 1950, according to an affidavit by the purchaser's president, the parties met for the purpose of signing an agreement. Plaintiff was not present. A draft of the proposed contract had been made containing no escape clause. Defendants Rena and Helen Mayers arrived late during the meeting. In the affidavit of appellant, who was not present, it is stated that the insertion of an escape clause was then proposed by these two women.

All that is shown by affidavits of persons who were present. is that at the same time when defendants and the purchaser signed the contract, they also signed an escrow agreement that Special Term correctly read in conjunction with the contract of sale. This escrow agreement contained the following paragraphs which are material to the present dispute:

'' 2. If the Purchaser shall fail within two days after the notification to you of the successful conclusion of the loan negotiations above mentioned to deliver said checks to you, or if the Sellers shall fail within two days after you have notified them that the Purchaser has advised you of the successful conclusion of the loan negotiations to deliver the certificates for the shares of stock of the Corporation as herein provided, then this escrow shall be deemed terminated, and you shall detach from the three counterparts of said agreement and destroy the signatures of the parties thereto at the foot thereof and return one counterpart without said signatures, to the Purchaser, and two counterparts without said signatures, to the Sellers, and said agreement shall be deemed of no force and effect.

'' 3. If at the end of two weeks from the date hereof you have not (a) received notification from the Purchaser of the successful conclusion of the loan negotiations above mentioned, and (b) received from the Purchaser the four checks above mentioned, and (c) received from the Sellers the certificates for the shares of stock of the Corporation as herein provided, then this escrow shall at the end of such two weeks period, be deemed automatically terminated, and you are to detach from the three counterparts of said agreement and destroy the signatures of the parties thereto at the foot thereof and return one counterpart without said signatures to the Purchaser and two counterparts without said signatures to the Sellers, and said agreement shall be of no force and effect.''

It appears not to be questioned that under this language both purchaser and sellers reserved an unconditional right to cancel the contract of sale. The exercise of their respective options to cancel was to be manifested by omission to deposit with the escrow agent the stock certificates, indorsed for transfer, in case of the sellers, and the checks to apply upon the purchase price, in case of the buyer. Defendants exercised the election reserved to them by omitting to deliver their stock certificates to the escrow agent, and by notifying him that they would not consummate the sale. Although the purchaser's president makes affidavit that the purchaser would have closed had not the sellers withdrawn, the fact is that the purchaser also omitted to deposit its checks with the escrow agent, which was the procedure provided to evidence withdrawal by the purchaser. At most, whatever opinion may now be entertained by the purchaser's president concerning the action which his corporation would then have taken, it cannot be known whether the purchaser would have exercised its right to withdraw if the sellers had not already done so.

Appellant contends that inasmuch as the sellers availed themselves of the escape clause, a commission was earned. In support of that position the cases are cited which hold that a broker's right to his commission cannot be defeated by the seller's refusal to complete the transaction after a purchaser has been procured to buy at a price and on terms previously specified by the seller, or in which the seller has acquiesced (*Stern* v. *Gepo Realty Corp.*, 289 N. Y. 274; *Mengel* v. *Lawrence*, 276 App. Div. 180). It is true that ''The risks of failure assumed by a broker, as enumerated in the leading case of *Sibbald* v. *Bethlehem Iron Co.* (83 N. Y. 378, 383, 384), do not include bad faith on the part of the employer.'' (*Pease & Elliman* v. *Hopt*, 136 Misc. 825.) The facts in the instant case differ, however, even if the circumstance be ignored that the purchaser omitted to deposit its checks with the escrow agent, in that here buyer and sellers reserved an option unconditionally to withdraw from the agreement to sell. Special Term has held that in exercising this option, the sellers were not guilty of bad faith toward the broker, but were merely pursuing a right which each party to the contract had reserved to himself, and the exercise of which by defendants counteracted any acquiescence in the terms of the deal. We think that this conclusion was correct.

It must be borne in mind that where a broker has failed to procure a customer prepared to buy at a price which the seller has specified, and no sale has occurred, the broker must prove

that the seller acquiesced in the transaction which the broker arranged. Moreover, under such circumstances, even where buyer and seller have agreed upon a sale, the broker cannot recover a commission where his prospective customer recedes from a willingness to buy (*Kampf* v. *Dreyer,* 119 App. Div. 134; *Kronenberger* v. *Bierling,* 37 Misc. 817; 33 A. L. R. 581). It is not enough that the buyer says that he wants to buy, if he later says that he does not know whether he wishes to buy or not, and contracts for leave to withdraw, and no sale is ever executed. That is a different type of condition from the happening of some external event, beyond the parties' control.

Plaintiff does not claim to have procured a purchaser at the price and on terms which defendants had designated, but rests his case upon the proposition that he did obtain one that was ready, willing and able to buy upon a basis less favorable to the sellers, which it is asserted that defendants subsequently acquiesced in and approved. Such acquiescence or approval is not established, however, if the manner in which defendants manifested it was by stating, in effect, that the proposed transaction was tentatively acceptable to them, but that they would need further time before giving final approval. If final approval were not to be forthcoming, defendants could not be held to have acquiesced in or ratified the basis for dealing which plaintiff had brought about.

Appellant appears to have recognized this, upon the argument, by basing the appeal upon the contention that the minds of the purchaser and defendants met orally on August 2, 1950, on the essential items of the transaction, and that what happened afterward is immaterial provided that the purchaser would have been willing to consummate the purchase notwithstanding his having been granted the right to withdraw. That differs from the complaint, which bases the cause of action on the signing of the written contract on August 4th, and the subsequent exercise by the sellers of their option to withdraw.

It is clear, however, that any meeting of minds which may have been reached on August 2d was tentative pending formalization and that, as Special Term observed, both the purchaser and sellers intended throughout that whatever agreement, if any, was reached, should be embodied in a formal written contract and that unless such written contract was executed neither was bound.

The undisputed fact is, as has been stated, that on August 4th when the papers were signed, the prospective purchaser was allowed an option to cancel the transaction in addition to the

178

similar privilege accorded to defendants. It does not matter, nor does it appear from the record except as hearsay, at whose instance these cancellation options were inserted in the agreement. Where plaintiff's cause of action depends, as it does here, upon proof that defendants adhered to a less favorable price and different terms of sale from those which plaintiff had been employed to effectuate, and where neither a sale nor a binding contract of sale has resulted, the circumstance cannot be ignored that the purchaser's willingness to buy was intercepted by a clause that enabled the purchaser as well as the sellers to withdraw unconditionally from any and every obligation. This privilege of escaping from the contract having been balanced by a corresponding right of withdrawal on the part of the sellers, the entire transaction was rendered inchoate and tentative in character in any event, as though it had been so from the beginning, with the consequence that neither party could be held to have broken faith with the other nor with the broker by failing to perform.

In this light it makes no difference which party elected to exercise its right to withdraw. If we were to look, however, only at the buyer's position, and make a determination only upon the basis of whether the broker had produced a purchaser who was willing to buy upon terms approved by the sellers, we would have to say that the plaintiff had not produced such a purchaser. We are left without the requisite certainty that the buyer would have completed the transaction. The indication that it would, and any statement from its president that it would, cannot be accepted in lieu of a commitment, and the fact that the purchaser retained the right to cancel up to the time the sellers exercised their right to cancel is decisive against plaintiff. We do not know and it can never be ascertained whether or not the purchaser ultimately would have cancelled. Willingness to buy is not merely a subjective mental process. The court cannot engage in speculative inquiry concerning whether Straus would have invoked its cancellation privilege if the defendants had not. Nor can plaintiff be given the benefit of what might be regarded as the probabilities or be excused from strict compliance with the requirement of producing a willing buyer because the defendants exercised a privilege which it was their right to exercise.

In this latter view of the case, it is unnecessary to determine whether, under the language of plaintiff's contract of hiring (which appears to have been drawn by plaintiff), a commission could be deemed to have been earned in any event until a binding executory agreement of sale had been signed. The words

that the commission was to be paid " upon completion of the transaction " point in that direction. Neither is it considered whether the brokerage contract with plaintiff is rendered unenforcible by subdivision 10 of section 31 of the Personal Property Law, in view of the oral change in the purchase price which had been submitted to plaintiff.

The order and judgment appealed from should be affirmed, with costs.

CALLAHAN, J. (dissenting). In my opinion Special Term erred in granting summary judgment for defendants. It did so on what appears to be untenable grounds. It held, in effect, that neither the sellers nor the buyer were irrevocably committed to each other on the sale of certain stock and that the broker had not earned his commissions even though the buyer was ready, able and willing to buy and the sellers were the ones who refused to complete the sale.

The agreement gave the broker an exclusive right to sell all defendants' stock in L. & C. Mayers Co., Inc., on or before August 31, 1950, for the price of $2,500,000 " for all the shares, payable in cash, or upon such other terms as may be acceptable to you (the sellers) ". The contract continued: " should I obtain a purchaser by that date, but the transaction should perchance close thereafter, my commission nonetheless will have been earned." It then said: " Because the deal is capable of being worked out in different ways, our understanding is that I am to receive my commission no matter what kind of assets you actually sell or in what form the transaction is cast."

The first question is whether the clause " upon completion of the transaction " was intended to create a condition precedent or to merely fix the time of payment. The context would seem to ascribe to it the latter meaning. In any event it is well settled that in the absence of a covenant clearly indicating an intent to exculpate the seller upon his own refusal to complete, the employer cannot deprive the broker of his commissions by the employer's failure to consummate the trade, after the broker has produced a buyer ready, able and willing to buy on the seller's terms. (*Clinchy* v. *Grandview Dairy*, 262 App. Div. 51, affd. 288 N. Y. 502; *Colvin* v. *Post Mtge. & Land Co.*, 225 N. Y. 510; *Mengel* v. *Lawrence*, 276 App. Div. 180; *Sheridan* v. *McLaughlin*, 172 App. Div. 314.) We have no such exculpatory clause here.

The rule is clearly stated in the leading authority of *Sibbald* v. *Bethlehem Iron Co.* (83 N. Y. 378, 383-384) as follows: " If the efforts of the broker are rendered a failure by the fault of the employer; if capriciously he changes his mind after the purchaser, ready and willing, and consenting to the prescribed terms, is produced; or if the latter declines to complete the contract because of some defect of title in the ownership of the seller, some unremoved incumbrance, some defect which is the fault of the latter, then the broker does not lose his commissions. And that upon the familiar principle that no one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non-performance. But this limitation is not even an exception to the general rule affecting the broker's right, for it goes on the ground that the broker has done his duty, that he has brought buyer and seller to an agreement, but that the contract is not consummated and fails through the after-fault of the seller."

It is quite apparent that the sellers never attempted to terminate the employment of the broker in the present case, and thus the question is not presented as to whether they did so in good faith before the commissions were earned. In fact, the sellers could not terminate, for the contract of employment gave the broker the exclusive right to sell until August 31, 1950. The termination of the deal by the sellers occurred before that date.

The only issue of any moment here is whether the broker performed the terms of his employment by procuring a buyer, who was ready and willing to buy on the terms prescribed by the seller. This depends mainly upon whether the sellers in the course of negotiations agreed to modify the prescribed terms of sale so as to accept a price of $2,170,000 in cash, plus 12,500 shares of stock of the buyer corporation.

The written contract of employment required the broker to get $2,500,000 payable in cash or upon such other terms as might be acceptable to the sellers. As the price of $2,170,000 plus the stock, was apparently less than $2,500,000, plaintiff was required to establish that the sellers had agreed to accept the lesser price that the broker got, that the buyer agreed to contract at the reduced price, and that the sellers then refused to close the deal. The plaintiff says that the buyer insisted that the sellers take some stock of the buyer corporation, and that they claimed that certain assets had been overvalued, and on August 2, 1950, the sellers agreed to the modified terms. Such a modification of the selling price would amount to a modification of the broker's obligation. The seller would be bound by the modified terms

of employment, if he availed himself of the continued service of the broker. There would be no doubt that the commission would have been earned, if an executory contract of sale had been entered into at the altered price. (*Bliven* v. *Lighthouse*, 231 N. Y. 64; *Colvin* v. *Post Mtge. & Land Co., supra; Tanenbaum* v. *Boehm*, 202 N. Y. 293.) I see no reason why the same rule should not be applied, if the broker obtained a willing buyer at the new terms and the seller then changed his mind or capriciously refused to close the deal at the new price (*Ostroff* v. *Doctor*, 238 N. Y. 264; *Mooney* v. *Elder*, 56 N. Y. 238).

Upon this appeal the sellers take the position, at least in their briefs, that they did not agree to accept the reduced price. It cannot be denied, however, that after several drafts of a complete contract were drawn, a final contract was signed by all the sellers and the buyer providing for a sale of $2,170,000 plus 12,500 shares of stock. This lends strong support to the plaintiff's claim that such price had been accepted by the sellers. It could be possible, of course, that this whole process of drawing contracts was tentative, and that the sellers had reserved their acceptance of the reduced price pending the completion of loan negotiations by the buyer. If this was so, the sellers were required to come forward with unequivocal statements to such effect in answer to the broker's motion for summary judgment. I find no such statement in this record. In fact, I find no direct denial that the sellers had agreed to the reduced price.

The written agreement of sale though signed was not delivered but held in escrow by one of the attorneys under an arrangement whereby the buyer had a certain period to complete pending negotiations for financing. The buyer was to advise the escrowee of the successful completion of these negotiations and the escrowee was to convey that information to the sellers whereupon the sellers were to deposit the stock to be sold with the escrowee and the purchaser was to deliver certain purchase money checks. The sellers, however, had the right under the escrow agreement to refrain from delivering the stock and the escrow agreement was thereupon to be terminated and the signatures to the agreement destroyed.

What happened thereafter is not in substantial dispute. The buyer did notify the escrowee of the successful completion of the loan negotiations and his readiness to close and the escrowee conveyed this information to the sellers. The sellers' attorney thereupon advised the escrowee that the sellers were not going to complete the sale. This was clearly a rejection of the deal by the sellers and the buyer was not required to deposit the

checks. They aver, without contradiction, that they were at all times ready, able and willing to complete the purchase.

The only fact set forth in the sellers' affidavit is that the broker was hired to complete a sale at $2,500,000 and he failed to obtain this price. They make no reference to the alleged modification of the price and terms and fail to deny the facts set forth in the plaintiff's affidavits with respect thereto. Nor do defendant sellers deny plaintiff's allegations with respect to the claim that the sellers were the ones who backed out of the deal. The sellers do not attempt to explain why the escrow agreement contained a clause giving them the right to withdraw from the sale, nor do they attempt to explain their action in failing to complete.

It does not appear to me that the fact that the buyer's acceptance was temporarily conditional alters the case in view of what subsequently happened when the buyer made its willingness to take unconditional. The sellers' option to escape selling vis-a-vis the buyer and their exercise of that option, did not permit them to escape liability to the broker. The brokerage contract had no escape clause. Commissions were due if the broker produced a buyer before August 31st, and the present buyer made his willingness to take unconditional before that date.

The case is somewhat analogous to one where the buyer takes an option to buy. No liability for commissions would arise until after the exercise of the option by the buyer, but the seller would be liable for commissions, when the buyer exercised the option, if the seller then refused to complete the sale (*Seidman* v. *Rauner,* 51 Misc. 10).

A point has been raised that under subdivision 10 of section 31 of the Personal Property Law any modification of the broker's contract is required to be in writing. Here the broker had a written contract, and the alleged modification refers to the sales price and not to any other term of the broker's employment. It would not seem to me to be the intent of the Legislature that the sales price was to be deemed such an essential part of a brokerage contract so as to require it to be in writing. In other words, it would not seem that the Legislature intended that a new broker-age contract or a new writing was to be drawn with each modification of the terms of sale during the course of negotiations. Be that as it may, the provisions of the present contract were broad enough to show an obligation to pay commissions upon a sale on any agreed terms, or in whatever form the transaction was cast, so that the present writing would appear to satisfy the statute.

For the reasons indicated, direction of summary judgment for defendants was improper. There being no sufficient statement of facts in the defendants' affidavits to show any triable issue with respect to the earning of commissions by the plaintiff, the plaintiff should have summary judgment. I vote to reverse the order appealed from and award plaintiff summary judgment.

PECK, P. J., and BREITEL, J., concur with VAN VOORHIS, J.; CALLAHAN, J., dissents and votes to reverse, in opinion.

Judgment and order affirmed, with costs.