**OIL TRADING ASSOCIATES, INC.,**
Plaintiff,

v.

**TEXAS CITY REFINING, INC.,**
Defendant.

United States District Court
S. D. New York.
Jan. 26, 1962.

See also 199 F.Supp. 829.

Milton Pollack, New York City, for plaintiff.

Carter, Ledyard & Milburn, New York City, for defendant. Edwin H. Krom, Wesley J. Liebeler, New York City, of counsel.

DAWSON, District Judge.

These are motions and cross-motions for summary judgment on the third and fourth causes of action set forth in the complaint. There are ten causes of action in the complaint, all growing out of alleged violation of a contract dated May 1, 1952, a copy of which is attached to the complaint, wherein the defendant appointed plaintiff as exclusive agent for the purchase of crude oil and sale of the products of defendant's refinery, and provided for commissions on such purchases and sales. Both parties state that no facts are in controversy on the third and fourth causes of action and both desire summary judgment.

### Third Cause of Action

Plaintiff moves for summary judgment in the amount of $5,256.44 on the third cause of action, claiming defendant's failure to pay commissions due to it on a certain sale of oil by defendant to Metropolitan Petroleum Corporation, which contract was negotiated and arranged for by plaintiff in its capacity as defendant's sales agent. This contract with Metropolitan Petroleum Corporation, which became effective December 29, 1953, provided that defendant would sell to Metropolitan six "T–2 sized cargoes," 10% more or less at Metropolitan's option, in each of the three years 1954, 1955 and 1956, delivery of one T–2 cargo to be made at six specified times during each year. The contract defined a T–2 cargo as containing 114,700 barrels.

During 1954 deliveries actually made pursuant to the Metropolitan contract were greater than the amounts set forth in the delivery schedule by some 113,277 barrels. Apparently deliveries made in the early part of the first quarter of 1955 were also being made at a greater rate than set forth in the original contract. In February 1955 a letter was exchanged between the defendant and Metropolitan reading as follows:

"Metropolitan Petroleum Corporation
514 Kinderkamack Road
Oradell, New Jersey

"Attention: Mr. C. J. Blake

"Gentlemen:

"Per your recent conversations with Oil Trading Associates, Inc., we confirm the understanding that the first 345,000 barrels of No. 2 oil lifted by you through the first quarter of 1955, under contract dated December 29, 1953, will be the con-

tract quantity. Accordingly, the contract quantity will be increased by any excess over and above 345,000 barrels effected by the following liftings.

| Date | Quantity | Vessel |
| --- | --- | --- |
| January 12 | 97,555.28 | VALCHEM |
| January 1/31 | 17,444.77 | Balance of T-2 |
| February 8 | 96,558.11 | VALCHEM |
| March 8/9 | 75,000.00 (estimated) | VALCHEM |
| March 23 | 95,000.00 (estimated) | VALCHEM |

"As of March 31, 1955, there will be an unlifted balance of nine (9) T-2 cargoes of approximately 115,000 barrels each remaining under the above mentioned contract.

"If the above conforms with your understanding, please sign one copy of this letter and return it to us for our files.

> "Very truly yours,
> William H. Fetter
>
> William H. Fetter
> General Manager

"WHF:MM
ACCEPTED:
This 28 day of February, 1955
METROPOLITAN PETROLEUM CORPORATION
By C. J. Blake"

Deliveries continued to be made under this letter agreement of February 28, 1955 until April 27, 1956, at which time defendant and Metropolitan cancelled the existing contract and entered into a new agreement effective July 1, 1956. In the meantime the Sales Agency Agreement between plaintiff and defendant had been cancelled effective as of November 15, 1955.

Under the terms of the basic Sales Agency Agreement between the parties it was provided that

"After the termination of this contract, whether on December 31, 1953 or at any other date, commissions shall continue to be paid to us monthly upon all deliveries against open contracts in force upon the said termination date, but we shall not be entitled to commissions for deliveries, after such termination, under any renewals of any contracts completed after such termination."

There is no dispute that the original contract with Metropolitan was an "open contract in force" on November 15, 1955, the date of the termination of the Sales Agency Contract. The parties do disagree, however, on the amount of oil yet to be delivered under this "open contract." The dispute arises as a consequence of different interpretations of the second paragraph of the February 28, 1955 letter agreement.

It is the position of the defendant that the total amount to be delivered under the contract with Metropolitan was 2,064,600 barrels over the term of the contract, i. e., eighteen T-2 sized cargoes, each of which was to be 114,700 barrels; that the mere fact that more barrels were delivered in the earlier part of the contract than was originally contemplated did not increase the total amount which would be open at the time of the termination of the Sales Agency Agreement.

On the other hand, it is the position of the plaintiff that the letter agreement of February 28, 1955 amended the original agreement with Metropolitan so as to provide that despite the additional deliveries which had been made in the early part of the contract, nevertheless, as of March 31, 1955 there would still be nine T-2 cargoes of approximately 115,000 barrels each to be delivered from that date on. It appears from the papers that in fact nine T-2 cargoes or 1,035,000 barrels were delivered by Texas to Metropolitan subsequent to March 31, 1955.

The question is whether this entire amount was delivered pursuant to the letter of February 28th (an "open contract" in force at the time of the termination of the Sales Agency Contract) or whether a portion of it (167,969.46 barrels, delivered in the early part of 1957) was delivered under a renewal contract of June 30, 1958.

The issue on these motions comes down to a determination of the meaning of the second paragraph of the agreement of February 28, 1955. Was it intended to increase the total amount to be delivered under the original contract with Metropolitan? Was the statement that as of March 31, 1955 there would be an unlifted balance of nine T-2 cargoes an amendment of the original agreement so as to increase the total amount to be delivered, or was it merely a mistake in the assumption of the writer of the letter that half the cargoes had been delivered by that date and that half still remained to be delivered? The plaintiff maintains that the agreement of February 28, 1955 was an amendment of the original Metropolitan contract so as to increase the total amount to be delivered thereunder. Defendant maintains that it was not such an amendment. Such conflict in interpretation is specifically pointed up by statement "25" of the statements of alleged undisputed facts submitted by counsel for defendant pursuant to Rule 9(g) of the rules of this court. After reciting the language of the letter of February 28, 1955, defendant alleges that an undisputed fact was that "Metropolitan and defendant did not intend by such language to increase the quantity of No. 2 heating oil so to be delivered." Plaintiff disputes this alleged fact and maintains that the intention of the parties was to increase the amount of oil to be delivered.

█ We have, therefore, an important issue of disputed fact. This dispute cannot be determined merely from the language of the agreement of February 28, 1955. It must be determined in the light of the negotiations of the parties and the business relationship of the parties.

The letter itself is ambiguous. Where a contract is ambiguous, and parol evidence is relevant and material to the issue of construction, a question of fact is presented.

██ It is the aim of the courts in interpreting a written contract, to give effect to the mutual intention of the parties as it existed at the time of the execution of the contract. It cannot be determined from the facts before the Court whether the parties ever considered the question now presented, or if they did, what their intention was. Such determination may not be made on affidavits but can only be determined after trial. It would be premature to grant summary judgment under these circumstances, even though both parties have moved for summary judgment. Farrand Optical Co. v. United States, 107 F.Supp. 93 (S.D.C.N.Y.1952).

█ The Court is under no duty to grant summary judgment merely because both parties have moved for it. Volunteer State Life Insurance Company v. Henson, 234 F.2d 535 (5th Cir. 1956).

█ Where a written agreement is ambiguous the intent of the parties who executed it is important, and if the intent is disputed a genuine issue of material fact exists which cannot be determined upon a motion for summary judgment. Severson v. Fleck, 251 F.2d 920 (8th Cir. 1958); Rolle Mfg. Co., Inc. v. Marco Chemicals, Inc., 92 F.Supp. 218 (D.C.N.J.1950).

The motion and cross-motion for summary judgment on the Third Cause of Action are denied.

### Fourth Cause of Action

This claim arises out of the Agency Contract between the parties, which contract was dated May 1, 1952. The following facts exist without substantial controversy:

A contract for the sale of gasoline, negotiated by plaintiff, between defendant and Time Oil, was entered into on January 27, 1954. Under this contract, as amended by letter of March 8, 1955,

Time had the option to require defendant to deliver 135,000 additional barrels of gasoline during the third quarter of 1956. Time exercised this option and requested the delivery of 135,000 barrels. On August 8, 1956, however, defendant and Time, by letter, mutually agreed to forego delivery of this quantity. Instead defendant promised to pay Time one-quarter cent per gallon on the defaulted delivery quantity, and in addition to make delivery of a similar amount during the first quarter of 1958. Some time before this delivery in 1958 could be made, however, the entire contract between Time and defendant was cancelled by mutual consent.

Plaintiff claims it is entitled to commissions on the value of the gasoline which defendant was required to deliver to Time when Time exercised its option. Plaintiff concedes that the contract was later cancelled, delivery never made and payment never received by defendant. Plaintiff nevertheless contends that it had an absolute and unconditional right to commissions on the "option" cargo, which right adhered the moment Time exercised its option and bound defendant to deliver thereby, and that any subsequent acts by the parties could not operate to defeat its right to commissions. Plaintiff argues that it did all that it was required to do under its contract with defendant, that is, negotiated the Time-Oil contract and submitted it for approval and signature by defendant.[1]

In answer to plaintiff's arguments, defendant urges that although the general rule is correctly stated (i. e., an agent earns his commissions when he produces a person ready and willing to enter into a contract on his principal's terms) there

is a very clear exception when the agent and principal agree that the agent is to receive his commission only upon the happening of a certain subsequent event or condition. Defendant argues that plaintiff's right to commissions did not become absolute upon the signing of the contract but rather is contingent upon subsequent events and conditions.

Defendant claims three conditions precedent to plaintiff's right to receive commissions:

(1) The second sentence of paragraph 2 of the Sales Agency Contract specifies the date of commission payment to plaintiff as being the 10th day of the month following the calendar month in which *payment was received* by defendant. Defendant contends that, therefore, receipt of payment by it is a necessary prerequisite to payment of commissions to plaintiff. Plaintiff asserts that this sentence was intended merely to fix the *time* for payment most convenient to the parties, rather than the *right* to receive commissions.

(2) The first sentence of paragraph 3 talks of commissions of "¾ of 1% of the invoiced value of all sales. * * *" Defendant says that this is an implied condition that invoices must be prepared. It is plaintiff's position that the "*invoiced* value" refers merely to the price of the gasoline sold as specified in the contract.

(3) Paragraph 4 of the Sales Agency Contract says that commissions are to be paid to plaintiff "monthly upon all deliveries against open contracts" after the termination of the Sales Agency Contract. Defendant says that since there were no deliveries of the optioned cargo here there are no commissions ow-

1. Paragraphs 3 and 4 of the Contract provide:

"3. As compensation for our services, you are to pay us a commission of ¾ of 1% of the invoiced value of all sales excepting sales of residuum, upon which you are to pay us 1¢ per barrel. Commission shall be paid to us not later than the 10th of each month for payments received during the previous calendar month.

"4. After the termination of this contract, whether on December 31, 1953 or at any other date, commissions shall continue to be paid to us monthly upon all deliveries against open contracts in force upon the said termination date, but we shall not be entitled to commissions for deliveries, after such termination, under any renewals of any contracts completed after such termination."

ing to plaintiff. Plaintiff says that this paragraph means only to continue its right to receive commissions after the Sales Agency Contract terminated and should not be read to impose a condition precedent to such right to receive commissions.

In short, plaintiff claims that it is entitled to receive commissions absolutely and unconditionally upon acceptance and signing of the Time contract by defendant and Time and the subsequent option exercised by Time. Texas urges that Oil Trading's right to commissions accrues only after (1) *invoices* have been prepared, (2) *payment* has been received defendant from Time, and (3) *delivery* has been made by defendant to Time.

It seems clear, from a reading of the contract as a whole, that the parties intended that plaintiff's right to commissions be fixed as of the time plaintiff procured a customer willing to enter into a contract on defendant's terms, and a contract was thereafter accepted and entered into by the principals. The so-called "conditions" merely attempted to set forth a convenient time for payment.

But there is no need to rest this decision solely on the foregoing basis since, as plaintiff points out, even if its right to payment was conditional, it is nevertheless entitled to recover because it was the action of defendant which prevented the occurrence of those conditions.

A seller who is obligated to a broker for commissions upon the occurrence of certain conditions cannot relieve himself of the obligation to pay those commissions by acting in such way as to prevent the occurrence of those conditions. As the court held in Polley v. Plainsun Corp., 7 Misc.2d 605, 166 N.Y. S.2d 184 (1957), at 189: "Not only are promises for positive performance implied, but the negative duty of a promisor not to prevent performance of any condition qualifying his promise is likewise implied." And further quoting Sidella Export-Import Corp. v. Rosen, 273 App.Div. 490, 492, 78 N.Y.S.2d 155, 157 (1st Dep't 1948): "Every contract

of agency carries with it an implied obligation on the part of the principal to do nothing that would thwart the effectiveness of the agency." See also, Stern v. Gepo Realty Corp., 289 N.Y. 274, 45 N.E.2d 440 (1942); Weiner v. Infeld, 116 Misc. 323, 190 N.Y.S. 82 (1921); Colvin v. Post Mtg. & Land Co., 225 N.Y. 510, 122 N.E. 454 (N.Y.Ct. of Appeals 1919).

This is equally true in the case where the principals to a contract mutually rescind or cancel the entire contract, thereby preventing delivery, payment, invoicing or any number of conditions the occurrence of which may have been prerequisite to the broker's right to collect commissions. The law is authoritatively summed up in 3 Corbin on Contracts, § 768, p. 956 (1951) as follows:

> "If the owner, after the broker procures an able and willing purchaser and there is mutual assent on terms, prevents the happening of the condition by refusing to make the conveyance or by a voluntary rescission of the agreement with the purchaser, the condition is eliminated and the broker can get judgment for the agreed commission."

See also, Frederick Zittel & Sons v. Schwartz, 192 App.Div. 353 (1st Dep't 1920), 182 N.Y.S. 638, 642:

> "It is unnecessary to cite authorities to the proposition that if a vendor voluntarily releases a vendee from his contract, which might have been enforced, the broker of the vendor may recover his commissions. To defend against the broker's claim, the vendor must at least show that his consent to the cancellation of the contract was a consent to a legal right in the vendee. [Citing cases]."

Defendant points to a portion of the Texas-Time contract which reads, inter alia:

> "Should Seller and Buyer decide not to exercise respective rights to require delivery and effect delivery, then cargo will not be lifted and

the quantity, per PP 1, and the applicable quantity specified in PP 5 shall be reduced by an amount equivalent to the cancelled cargo."

Defendant argues that the above clause is sufficient to release it from liability to plaintiff since it was contemplated by both the parties that certain events or business conditions might make fulfillment of the contract impractical or impossible. Defendant further argues that plaintiff, having negotiated the Texas-Time contract was well aware of this possibility and cannot now be heard to demand compensation as a result of the joint exercise of this cancellation clause.

■■ It is well-settled that all the parties to a contract, acting together, can rescind, revoke, cancel or modify a contract in any way they wish. The Joint Cancellation Clause, cited above, does no more than set forth the law as it exists. With or without a Joint Cancellation Clause, the contracting parties can jointly cancel; but in so doing, they cannot defeat a broker's claim for compensation. Frederick Zittel & Sons v. Schwartz, supra.

■ There are cases where one or both of the parties to a contract reserve a *unilateral* right to revoke or rescind the contract, and in these situations, when a contract is cancelled, the broker is denied recovery. Wiesenberger v. Mayers, 281 App.Div. 171, 117 N.Y.S.2d 557 (1st Dep't 1952). The reason for denying recovery to a broker in these cases is obvious: there may very well be no contract for lack of mutuality, or if there is a contract, it may be voidable. In any case, as the court in Wiesenberger said (p. 177, 117 N.Y.S.2d p. 563):

"* * * This privilege of escaping from the contract having been balanced by a corresponding right of withdrawal on the part of the sellers, the entire transaction was rendered inchoate and tentative in character in any event * * *."

But the case at bar presents an entirely different situation. The contract was binding on both parties, an option was exercised and defendant became obliged to deliver the 135,000 barrels of gasoline. The later cancellation by defendant, even though done in conjunction with Time, was an act which prevented the happening of the conditions. The principal cannot, by his own act, prevent the conditions and escape payment of broker's commissions.

Any statement of material fact not controverted by the opposing party is deemed admitted, according to Rule 9(g) of the Rules of this court. Plaintiff's statement of fact, filed pursuant to Rule 9(g) alleges the contract price of the optioned cargo was $687,372.50, and plaintiff's commission on said quantity is $5,155.29. This allegation has not been controverted by the defendant. Plaintiff is entitled to summary judgment in the amount of $5,155.29 on the Fourth Cause of Action. So ordered.