BROADSTONE REALTY CORPORATION, Plaintiff,

v.

Thomas Mellon EVANS, Defendant.

United States District Court
S. D. New York.

March 10, 1966.

Nixon, Mudge, Rose, Guthrie & Alexander, New York City, Leonard Garment, and Douglas M. Parker, New York City, of counsel, for plaintiff.

Kissam & Halpin, New York City, James Halpin and James J. Harrington, New York City, of counsel, for defendant.

FRANKEL, District Judge.

## I.

Plaintiff, a real estate broker licensed in New York, sues for a $50,000 commission it claims to have earned by producing a "ready, willing, and able" buyer for some sixty parcels of realty (the "Safeway Properties") located in nine states. The facts, substantially undisputed, are these:

The Safeway Properties are plants, stores, and warehouses occupied under individual leases by Safeway Stores, Incorporated. Originally owned by Safeway, they were in 1951 sold to, and leased back from, the Argosy Fund, which was later merged into West Coast Properties, Inc. In 1957, the defendant became owner-lessor by purchase from West Coast Properties.

Defendant held the leased properties subject to a first mortgage and trust indenture securing an original bond issue of $25,000,000, which had been reduced to $12,984,000 by the time (late 1961) which concerns us. The lien of the mortgage was allocated among the parcels in accordance with appraised values assigned to each of them. The bulk of the rentals under the leases was required for payment of interest and amortization of the bonds, with a balance of "cash flow" remaining for the defendant as successor mortgagor.

Under the terms of each lease, Safeway was empowered to terminate by tendering 90 days' notice together with an offer to purchase the property for the unamortized balance of the mortgage allocable to that property plus one-half of one percent of this balance. The owner was then to have 45 days within which to accept the offer. If he accepted, the purchase price was to be applied to liquidate the mortgage balance allocable to the particular property, and the property was to be conveyed to Safeway free and clear of any other liens or mortgages. If the purchase offer was rejected, the owner was likewise required to liquidate the applicable portion of the mortgage balance, and the lease would terminate 90 days after Safeway's notice. As will appear below, these interrelated lease and mortgage obligations were to become critical in frustrating the transaction out of which plaintiff's claim arises.

In late August or early September of 1961, David Bolger, then an assistant vice president of plaintiff and formerly (until April 1961) defendant's employee, met with the defendant and asked whether he might be interested in selling the Safeway Properties. The defendant, influenced by existing tax considerations and by the possible impact of tax legislation then under consideration, encouraged Bolger to seek a suitable purchaser for a sale in that calendar year. Bolger prepared a draft proposal, returned to discuss it with defendant, and was then authorized by defendant to prepare a definitive offering memorandum. Bolger circulated such a memorandum and made personal soundings in search of potential

buyers. Around the beginning of November he was introduced to the attorney for Charles B. Benenson, who quickly became interested in the proposition.

On November 6, 1961, Bolger presented to defendant an offer from Benenson proposing to purchase the Safeway Properties for $900,000 above the existing mortgage, the payment to be comprised of $500,000 cash and a $400,000 second mortgage. In this initial proposal, noting that his purchase price was higher than the Safeway recapture price (namely, existing mortgage balance plus ½%), Benenson sought a provision that would have reimbursed him for any loss on such recapture. Defendant rejected the offer on a number of grounds, including the proposed price.

On November 8, 1961, Bolger transmitted to defendant a second Benenson offer, increasing the price to $1,000,000, with $500,000 cash and a $500,000 second mortgage. Among its other revised terms, this offer provided that if Safeway repurchased any of the properties, the balance of the second mortgage would be spread over those remaining in Benenson's hands. In reporting this offer to defendant, Bolger stated that Benenson wished to check with Safeway to determine whether termination of any of the leases was in contemplation. Defendant indicated that he was willing to have Benenson make such inquiries and inspect the properties before proceeding further.

After inspecting the stores and leases, Benenson submitted another offer, again delivered to defendant by Bolger, on December 4, 1961. This offer, in the form of a letter prepared by Benenson's attorney, contained, *inter alia*, the same proposed price of $1,000,000 above the existing mortgage. It was rejected by defendant because of two of its provisions: (1) that the parties would "work in good faith to complete the closing by December 31, 1961", and (2) that the offer was "subject to the drawing of a formal contract of sale, and documents of closing * * *." Both of these features were inconsistent in defendant's view

with his objective of insuring completion of a sale, if one were to be made, before the end of the calendar year 1961. This was essential from his standpoint in part because of anticipated tax law changes, mentioned above, that threatened disadvantageous results for him after that year. A cognate concern was his desire to complete the transaction in time to make transfers of the proposed second mortgage in the year 1961. Thus motivated, defendant was not satisfied to have merely "work in good faith" toward a 1961 closing. Similarly, he took the position that any hope of completion before the end of the waning year was doomed in advance if the parties were to wait out the lawyering "of a formal contract of sale, and documents of closing."

On December 6, 1961, Bolger delivered to defendant another revised offer from Benenson, likewise prepared by the latter's attorney, eliminating the provisions to which defendant had objected. This offer, in the form of a letter from Benenson to defendant, was accepted by defendant's writing the word "Accepted" and his signature upon it.

The December 6 letter agreement stipulated a purchase price of $1,000,000 over the existing mortgage, with a cash payment of $400,000 (including $50,000 tendered by Benenson with the letter), a second mortgage of $550,000, and Benenson's personal notes for $50,000, payable in 1962. The second mortgage was to cover all the properties except specified stores Safeway was then planning to repurchase. Three aspects of the letter agreement have come to be central in the present dispute:

(1) A subparagraph governing the handling of the second mortgage with respect to any properties on which Safeway might exercise its right to give notice of termination and an offer to repurchase. The pertinent terms of the agreement on this subject said: "In event of offer to recapture by Safeway of any property * * *, that portion of the [second] mortgage affecting the particular property including ac-

crued current and deferred interest attributable to the particular property, will become due and payable if Safeway's offer is rejected. If Safeway's offer is accepted, the unpaid balance will 'swing' to the remaining properties. All interest on that portion of the mortgage will thereafter be deferred until maturity. The $550,000. purchase money mortgage will be allocated in accordance [with named appraisal values].  *  *  * Adequate provision will be made for release of individual properties, and the mortgage shall provide for privilege of prepayment of the whole or part at any time with no penalty, and shall provide that there shall be no personal liability thereunder, and the holder shall look to the property only for payment.  *  *  *"

(2) An "escape clause," which read:

"If for any reason whatsoever, including the fault of the buyer, said transaction shall not close by December 28, 1961, then the $50,000. good faith deposit shall be returned to the buyer and neither party shall be liable to the other for any matter or thing."

(3) A provision that the seller was "to execute at the closing such instruments as may reasonably be required by counsel for the buyer; and all documents at the closing are to be approved by counsel for both the buyer and seller."

Along with, and on the date of, the foregoing contract with Benenson, defendant executed the brokerage commission agreement on which this action is brought. This second document, in the form of a signed letter from Bolger, accepted and signed by defendant, read as follows:

"Referring to our telephone conversation and the letter of December 6th from Charles Benenson addressed to you which I hand-delivered to your office, we are agreeable to accepting $20,000 of the com-

mission at the time of closing and the balance of $30,000 will be due and payable by assignment in two installments of $15,000 each on June 1, 1962, and November 30, 1962, upon payment of the $50,000 balance of the cash consideration due you from Mr. Benenson. The two installments will bear interest at 5% per annum, the same interest which will be paid by Mr. Benenson."

It was originally planned that the parties would close in New York City, the scene of most of the dealings that led to the December 6 contract of sale. Some days after December 6, however, it was agreed that the closing would be accomplished at defendant's offices in Pittsburgh, Pennsylvania, on December 28, 1961. In the three weeks between the 6th and the 28th, attorneys for Benenson and defendant, with the participation and assistance of Bolger, worked at the preliminaries necessary to completion of the transaction. Among the steps accomplished during this period was the obtaining of consent from the holder of the first mortgage bonds and the trustee of the first mortgage indenture for the granting of a second mortgage upon the properties. The terms upon which this consent was granted included an undertaking by Benenson that within fifteen days after a termination notice by Safeway, he would clear any lien from the affected property or answer in damages to the trustee and bondholders for failure to do so.

On the morning of December 28, 1961, Bolger, counsel for Benenson, and defendant's counsel met at the latter's Pittsburgh office to complete and organize the closing papers. The morning's labors were uneventful until Benenson's attorney reached the problem of handling his client's projected obligation to discharge from the lien of the second mortgage any property with respect to which Safeway might give a notice of termination. Stressing that Benenson would be under a time limitation for obtaining

such releases,[1] he argued that Benenson would need a means of obtaining them in the event of defendant's unavailability or inability to perform. He also noted in this connection the potential complications entailed by defendant's plan to transfer at least portions of his second mortgage interest promptly after the sale to Benenson. For these reasons, he proposed that Lawyers Title Company of Virginia (which was handling recordation and other aspects of the transaction), or some other agency acceptable to defendant, be empowered to execute releases upon the happening of the events entitling Benenson to them.

Defendant's counsel said the proposal seemed novel to him. He said, however, that he would (and he did) prepare a handwritten draft of a power of attorney to accomplish what Benenson's attorney wanted. He undertook to lay the subject before defendant, without a recommendation, for defendant's decision, observing that it would be a matter for defendant's business judgment to determine whether or not to accede to the proposal.

This matter proved to be the rock on which the deal foundered. Armed with the draft power of attorney and other equipment, the lawyers and Bolger repaired to defendant's Pittsburgh offices on the afternoon of December 28. There, with no other obstacles in the way of closing, defendant refused to give power to Lawyers Title or anyone else to execute releases of the second mortgage. He was unwilling, he said, to have anybody else sign his name on documents and in this way exercise control over his affairs. In the course of this lawsuit, while being deposed some 18 months after the aborted closing, defendant was led to enlarge at some length on his reasons for refusing to sign the power of attorney. He stated that the asserted

problem of his unavailability when a release might be needed was a chimera because he was "never more than a day or so from [his] office." He felt that Bolger, having worked for him shortly before, knew of this, and that "it began to smack of bad faith on the part of Benenson to bring up at the last minute" the proposal that he sign a power of attorney. He noted that, as owner and mortgagor of the properties, he had never had any comparable provision for automatic release of the first mortgage by a third party. And he was unwilling, he said, to add to what he had promised even a slight risk that some third party might fraudulently or negligently release his second mortgage interest.

Defendant went on to explain his view that the agreement with Benenson was intended to leave the seller with power to use the second mortgage as a device for buying in any property with respect to which Safeway might exercise its power to terminate and offer to purchase. Defendant said retrospectively that this was a major factor in the thinking that underlay his refusal to sign the power of attorney.

But for the impasse on this subject, as defendant later testified and the parties have stipulated, the transaction would have closed. Defendant returned Benenson's $50,000 deposit, and the parties to the frustrated sale went hence, mutually absolved by the escape clause in their agreement.

In a letter dated January 24, 1962, plaintiff wrote defendant expressing regrets over the unconsummated sale, but claiming that it had earned, and demanding payment of, the $50,000 commission. Defendant's attorney replied in a letter of the following day, rejecting the demand. He wrote that defendant had been "well within his rights to refuse"

---

1. As noted earlier, Benenson had agreed with the first mortgage trustee to clear liens from any affected property within fifteen days after a termination notice by Safeway on pain of liability to the trustee and bondholder for damages resulting from his failure to do so. However, the Safeway leases allowed 75 days from notice of termination for the clearing of liens. Thus, it appears that Benenson would have had this longer period before he could incur any liability for failure to obtain releases of the second mortgage.

Benenson's demand for a power of attorney authorizing releases by a third party.

## II.

Of the several grounds on which defendant opposes plaintiff's claim, the court decides and sustains one: that defendant's refusal to give the power of attorney, first demanded by Benenson on the closing day, was no such arbitrary or capricious or unreasonable a position as to entitle plaintiff to its claimed commission of $50,000 upon the unconsummated transaction.

We start with the undisputed proposition that the broker in a situation like this earns his commission when he has produced someone ready, willing, and able to buy on the seller's terms. Westhill Exports, Ltd. v. Pope, 12 N.Y.2d 491, 240 N.Y.S.2d 961, 191 N.E.2d 447 (1963); Davidson v. Stocky, 202 N.Y. 423, 95 N.E. 753 (1911); Mooney v. Elder, 56 N.Y. 238 (1874).[2] Where, as here, the prospective parties to the sale remain free to reject the transaction without liability until the closing, the broker's right to a commission cannot ordinarily mature until the buyer appears at the appointed closing time exhibiting the requisite readiness, willingness, and ability. Wiesenberger v. Mayers, 281 App.Div. 171, 117 N.Y.S.2d 557 (1st Dep't 1952), appeal withdrawn, 306 N.Y. 732, 117 N.E.2d 910 (1954). To put it in terms of the present case, Benenson was free at all times until the closing, for any reason or no reason, to call off the deal, leaving himself and defendant free of liability either to each other or to plaintiff. Timmons v. Shumaker, 279 App.Div. 879, 110 N.Y.S.2d 294 (2d Dep't), aff'd mem., 304 N.Y. 749, 108 N.E.2d 614 (1952).

The defendant, however, while the "escape clause" gave him equal freedom vis-a-vis Benenson, could not so lightly shed his obligations under the brokerage agreement with plaintiff. To be sure, under that agreement defendant's duty to pay a commission was conditioned upon a successful closing. Amies v. Wesnofske, 255 N.Y. 156, 174 N.E. 436, 73 A.L.R. 918 (1931); Silhouette Realty, Inc. v. Welson, 24 A.D.2d 212, 265 N.Y.S.2d 193 (1st Dep't 1965). But defendant could not defeat plaintiff's right by his own unjustifiable refusal to close with a ready, willing, and able buyer. Thus, if completion of the transaction was blocked by defendant's refusal to close on the agreed terms, plaintiff is entitled to its commission. Stern v. Gepo Realty Corp., 289 N.Y. 274, 45 N.E.2d 440 (1942); Colvin v. Post Mortgage & Land Co., 225 N.Y. 510, 122 N.E. 454 (1919).

The obvious case is the one where the seller, presented with a buyer who is ready, etc., either refuses outright to proceed, or (what amounts to the same thing) adds a new term or demand to those on which the broker engaged to find the customer. In such a case the broker has earned his commission notwithstanding that there has been no sale and that accomplishment of a sale was an agreed condition in the brokerage contract. Stern v. Gepo Realty Corp., supra; Colvin v. Post Mortgage & Land Co., supra. Cf. Tanenbaum v. Boehm, 202 N.Y. 293, 95 N.E. 708 (1911); Davidson v. Stocky, 202 N.Y. 423, 95 N.E. 753 (1911); Mengel v. Lawrence, 276 App. Div. 180, 93 N.Y.S.2d 443 (1st Dep't 1949).

Here, on the other hand, the new term that blocked the sale was one proposed at the eleventh hour by the near-pur-

2. The parties have, correctly we think, tendered the issue decided herein as one of New York law. Somewhat inconsistently, defendant asserted that since the closing was set in Pittsburgh, the law of Pennsylvania applied, requiring dismissal of the suit because plaintiff lacked a Pennsylvania broker's license. The record leaves no doubt, however, that the Pittsburgh closing was a casual detail of a contract almost entirely negotiated in New York and properly subject to New York law. Accordingly, if this alternative defense were all it had, defendant would probably fare badly. Cf. Bitterman v. Schulman, 265 App.Div. 486, 39 N.Y.S. 2d 495 (1st Dep't 1943).

chaser. This makes no difference, says plaintiff, because the requested power of attorney was essentially implicit in the sales contract promise to make "adequate provision" for required releases of the second mortgage lien. Moreover, plaintiff argues, defendant had agreed in the contract of sale "to execute at the closing such instruments as may reasonably be required by counsel for the buyer;" and the proposed power of attorney was no more than such a "reasonably * * * required" "instrument."

While these contentions are not without substance, they fail in the end to sustain plaintiff's claim. As for the agreement between defendant and Benenson to make "adequate provision" for releases of the second mortgage, the parties to that agreement had already prepared (and Benenson and his wife had executed a week before the closing) the second mortgage indenture containing such a provision.[3] In this fairly standard fashion, the mortgage memorialized defendant's obligation to execute the contemplated releases when they might be required. Of course, the notion of "adequate" is a variable one; some things are more adequate than others. Under the second mortgage instrument he had executed, Benenson was undoubtedly less well protected than he would have been had defendant agreed to the proposed power of attorney. The possibility of a default by defendant, either intentional or because of his temporary unavailability or incapacity, was certainly one a careful lawyer might consider and seek to provide for. The possibility could

well have appeared livelier as a result of defendant's announced intention to distribute his second mortgage interest in part or whole to charitable beneficiaries. It was arguably reasonable, in short, for Benenson's lawyer to ask for the power of attorney.

It by no means follows, however, that defendant was unreasonable or capricious in refusing to give it. The request was first put to him on the afternoon of the last day set for closing. This factor alone has some bearing on the subject of reasonableness. The request at this late stage obviously entailed his giving up something of value: the reserved right, common to mortgagees, to determine for himself whether and when he was bound to grant releases. It was in no sense a request for something incidental to, or implicit in, what had been agreed upon. Indeed, the failure of Benenson's attorney to include it in the substantial pile of papers prepared beforehand (or to propose it in the weeks of negotiation preceding the December 6 agreement) is some indication in itself that this was no routine and clearly expectable elaboration of the existing terms.

The short of the matter is that defendant had made clear to Benenson and to plaintiff the terms on which the sale could be completed; Benenson demanded a new term entailing an addition of substance to the things defendant had agreed to give; and defendant was under no obligation, with respect to plaintiff broker or anyone else, to grant the additional demand, "however rea-

---

3. Paragraph 5 of the "covenants, terms and conditions" in this indenture said: "In the event that any Mortgaged Property is released from the lien of the Indenture [i. e., the first mortgage], the Mortgagee will concurrently therewith, upon request of the Owner of such property or of the Trustee under the Indenture, release such Mortgaged Property from the lien of this Mortgage without receiving or requiring any payment whatever in connection therewith; but the Mortgagors agree * * * to pay to the Mortgagee concurrently with such release (but not as a condition of such re-lease) a payment on account of principal and interest on the Mortgage Note equal to the assigned value of such Mortgaged Property * * * plus all accrued Current Interest and Deferred Interest on such amount to the date of payment; provided, however, that no payment of principal or interest shall be required in connection with the release of any Mortgaged Property which is sold to the Lessee upon termination of the Lease covering such Mortgaged Property in accordance with the terms of Paragraph Fourteenth of such Lease. * * *"

sonable [it] might be." Amott, Baker & Co. v. Bing, 13 Misc.2d 797, 798, 155 N.Y.S.2d 550, 551 (N.Y.Co.1956), aff'd, 3 A.D.2d 706, 160 N.Y.S.2d 805 (1st Dep't 1957). See also Schultz v. Griffin, 121 N.Y. 294, 24 N.E. 480 (1890), on remand, 5 Misc. 499, 26 N.Y.S. 713 (Super.Ct. 1893); Trulock v. Kings County Iron Foundry, Inc., 216 App.Div. 439, 215 N.Y.S. 587 (1st Dep't 1926); House v. Hornburg, 267 App.Div. 557, 47 N.Y.S.2d 341 (4th Dep't 1944), aff'd, 294 N.Y. 750, 61 N.E.2d 748 (1945).

The cases last cited deal with situations at least roughly comparable to ours —i. e., where seller-principals defeated claims for brokerage commissions after refusing to yield to demands by buyers on which there had been no agreement. While square analogies are hard to come by in these cases, we find further support for defendant in a precedent invoked by plaintiff, Tanenbaum v. Boehm, 202 N.Y. 293, 95 N.E. 708 (1911). In that case defendants engaged plaintiff brokers to find a lessee who would take certain land for a long term and agree, *inter alia,* to erect a new building upon it. The prospective lessors and lessee met at length, talked through and orally agreed upon the terms of the lease; then they shook hands and parted to await the reduction of their understanding to "good legal verbiage." Thereafter, however, the transaction failed because defendants insisted upon a provision for eviction by summary proceedings if the lessee defaulted in erecting the building, while the intended lessee refused consent to anything other than the ordinary remedy by way of ejectment. The defendants were held to have behaved unreasonably and were therefore liable for the brokerage commission they had agreed to pay "as soon as the transaction was closed."

While the shoe here is on the other foot (i. e., the new condition was demanded here by the buyer rather than the seller), that precedent is helpful in defining the pertinent test of "reasonableness." There, as here, the party proposing a new term was concerned about the ever present prospect of a default. It was at least "reasonable"—in the sense of rational and prudential—to *ask* for the swifter and more efficient remedy of summary proceedings. But it was "unreasonable" from the broker's view to make that issue the decisive obstacle to closing.

A judgment for defendant in the present case seems upon reflection an *a fortiori* matter. It is unnecessary here to decide whether Benenson's counsel was "unreasonable" in his last-minute insistence upon the added, "remedial" protection of a power of attorney. It is enough to say that defendant was not unreasonable in refusing to accede.

■ Plaintiff's opposite conclusion is not fairly supportable by the contract provision in which defendant promised to supply "reasonably * * * required" documents. This clause cannot be read to cover more than papers "governed by the contract and the customary practice for closing deals of the type involved." Thompson v. Mahurin, 348 Ill.App. 489, 492, 109 N.E.2d 375, 376 (1952). The power of attorney sought for Benenson, while it is not unheard of, is plainly outside this category of the routine.

What has been said thus far would dispose of the case but for the fact that defendant, during the lawsuit, included among his reasons for refusing the power of attorney his belief that the agreement with Benenson had reserved to him the option to buy in a mortgaged property following a notice of termination by Safeway. In this premise defendant appears to have been plainly mistaken. There was nothing in the agreement reserving any such power to him in his capacity as second mortgagee or otherwise. Had the sale been consummated, and had defendant later refused a release on this ground, he would evidently have been in dereliction of his duty and liable for resulting damages.

Thus, the picture is complicated by the fact that defendant's refusal to yield on the proposed new feature was motivated to some substantial degree by a

misunderstanding of what he had already agreed to. We conclude, however, that defendant is still entitled to prevail. In the first place, his misconception, announced long after the event, was not the sole ground of his adamant position.[4] Secondly, if we are correct in concluding, as we have, that the terms to which the parties had agreed did not fairly cover the proposed power of attorney, defendant's refusal to give it does not become "unreasonable" or "arbitrary" in the sense of plaintiff's claim merely because his grounds for being right included a large admixture of wrong reasons. Cf. College Point Boat Corp. v. United States, 267 U.S. 12, 15–16, 45 S.Ct. 199, 69 L.Ed. 490 (1925); Fratelli Pantanella, S.A., v. International Commercial Corp., 89 N.Y.S.2d 736, 739 (N.Y.Co. 1949).

Finally, on similar reasoning, plaintiff is not aided by the suggestion that the transaction had lost some or much of its enchantment for defendant by the time of the closing day.[5] Had Benenson arrived at the closing and insisted upon a $100 reduction in the price of $1,000,-000, defendant would have been privileged to stand fast without liability to plaintiff. This would have been so even if defendant had been yearning—and if his lawyer or someone said he had been yearning—for an excuse to avoid the sale. For reasons already canvassed, the demand for a power of attorney was not a less substantial divergence from the agreed terms. Defendant's motives, secret or announced, could not strip him of his privilege to give no more than he had promised.

Judgment will be entered dismissing the complaint and awarding costs of the action to defendant.

---

4. As noted earlier, defendant was also motivated in refusing to sign the power of attorney by his own (and his lawyer's) lack of familiarity with the device, by his recognition that it added risks on his side for which he had not bargained, and by a justifiable belief that a request of this kind should not properly have been sprung on the afternoon of the scheduled closing.

5. There was testimony, to which defendant objected, that defendant's Pittsburgh counsel, shortly before the closing date, had intimated that the tax considerations making the sale attractive had changed or were changing. Passing substantial doubts as to the propriety or probative value of such evidence, we assume for present purposes the inference plaintiff would want drawn.