Henry W. Lengyel, J.
This is a claim for the appropriation of claimant’s land pursuant to section 30 of the Highway-Law, and acts amendatory thereto, which proceeding is described as Lake Onondaga West Shore Development — North *742 west Arterial Connection, State Highway 54-5, Onondaga County, Map No. 86, Parcel No. 95. The appropriation map was filed in the Onondaga County Clerk’s office on January 6, 1955 and personal service was made on the claimant on December 7, 1959.
The claim herein was tried before a Judge of the Court of Claims and, by decision dated May 28, 1964, an award of $20,000.00 was made. The State appealed from the judgment entered after the Court of Claims decision. Said judgment was ‘6 reversed on the law and facts and a new trial granted. ’ ’ (Zogby v. State of New York, 26 A D 2d 899.) The principal grounds for reversal were the lack of comparable sales and the lack of proof relative to a probability of change in zoning from residential use to that of industrial use.
Before the appropriation subject property consisted of 13.393± acres of land without frontage on any highway. Said property was in an essentially rectangular shape. It ran from the Delaware, Lackawanna & Western Railroad Company right of way, in an easterly direction, to the former railroad right of way of the Empire State Liquidation Corporation which was west of, but in close proximity to, the west shore of Onondaga Lake.
'Claimant’s access to said property was by a farm crossing located at the northwest corner of said property, where the Delaware, Lackawanna & Western Railroad right of way abutted claimant’s land on the west and the State highway known as Van Vleck Road on the east. Said farm crossing was approximately 82.5 feet in length across said right of way and approximately 15 feet in width. It had been maintained by claimant and her predecessors in title for many years. The only use made of claimant’s land, however, prior to the appropriation was for agricultural purposes, primarily growing of grapes and truck garden vegetables.
As stated previously the Appellate Division in reversing the original decision did so, in part, on the lack of evidence relative to a probability of zoning change, residential to industrial/ From the evidence presented it became clear to this court that the Town of G-eddes has been most reluctant to grant a change in zoning from residential to industrial. However, claimant contends, as the Appellate Division, Fourth Dept., in Soron Realty Co. v. Town of Geddes (23 A D 2d 165 [1965]) held, that the zoning amendment which changed subject property from unclassified to Residential B was invalid and null and void, we must consider subject property in an unclassified zone in 1965 which permitted an industrial use. At first blush *743 we rejected claimant’s theory. It seemed to us that we were concerned with the actual zoning in place in 1955; and, that a willing buyer in 1955 would buy with such zoning in mind and without prospective court decisions in mind. However, after examining the zoning maps received in evidence and the aforesaid decision, we have arrived at the conclusion that subject property was in an unclassified zone in 1955 which permitted an industrial use.
We further consider that a willing buyer with knowledge of all the facts, which is one of the important criteria in determining fair market value, would not be knowledgeable unless assisted by counsel. We believe it within reasonable probability that such counsel would arrive at the same conclusion as did the Appellate Division in 1965. We, therefore, believe claimant’s property could be valued with an enhancement for probable industrial use.
The Soron decision held the 1954 amendments to the zoning ordinance to be “null and void.” By dictionary definition (Ballentine’s Law Dictionary [2d ed.]) “ null and void ” means, ‘1 That Avhich binds no one; that which is incapable of giving rise to any rights or obligations under any circumstances; that which is of no effect.” It is our finding that the intendment of the appellate court was consonant with said dictionary definition and cannot be held to have meant that said amendments were merely voidable. (See Matter of New York & Long Is. Bridge Co. v. Smith, 148 N. Y. 540.) As stated in the Soron decision (p. 168): “In view of our conclusion that the amendments to the Zoning Ordinance are invalid by reason of the failure to comply with the provisions of section 264 of the Town Law, it is not necessary to pass upon the other grounds of invalidity asserted by plaintiffs nor to determine whether a nonconforming use existed as to the remaining portion of their property, which by this decision is located in an unclassified sone.” (Emphasis added.) (See, also, Village of Williston Park v. Israel, 191 Misc. 6, affd. 276 App. Div. 968, affd. 301 N. Y. 713.)
We have not found any case in New York on the question of the effect of a court invalidation of a zoning ordinance, years after the appropriation, on the highest and best use of said property on the taking date; and, counsel have not directed us to any authority on this question in their briefs. However, essentially this problem was discussed in Jersey Cent. Power & Light Co. v. Morris County Land Improvement Co. (91 N. J. Super. 40 [1966]). The fact situation was different, especially in respect to knowledge on the appropriation date. In this *744 New Jersey case, the landowner was engaged in a proceeding attacking the zoning of its property on the vesting date of the appropriation and said zoning law was declared unconstitutional after the vesting date. However, the basic legal question was the same. The Superior Court of New Jersey, Appellate Division, stated in its decision (p. 49), the following: “ The ■Morris County Land case [40 N. J. 539] must be held as having declared the ‘ Meadows Development Zone ’ regulations void in their very inception. Accordingly, there was no valid zoning regulation with regard to the property in question at the time of the taking, and defendant was entitled to an instruction to that effect. This view is supported by Fox v. Snow, 6 N. J. 12 (1950), which drew a clear distinction between a legislative amendment and a judicial decision. The court there said: ‘ * * * [A] change of the established law by judicial decision is retrospective. It makes the law at the time of prior decisions as it is declared in the last decision, as to all transactions that can be reached by it. On the other hand a change in the settled law by statute is prospective only * * (at page 14) * * * Plaintiff exercises the power of eminent domain by grace of the State. Under our 1947 State Constitution, Art. 1, par. 20, the landowner must receive ‘ just compensation. ’ In our view, defendant has not received just compensation in the circumstances of this case. It was denied its constitutional rights when the zoning ordinance was enacted and while it was in effect. We should not freeze this injustice.” The zoning’ map, which became effective in 1942, zoned subject property as Zone 1, Exempt or Unclassified. In 1954 the zoning map was amended and subject property was placed in Zone 6 as Residential B. It is interesting to note that the land almost directly across the Delaware Lackawanna & Western Railroad right of way from subject property was zoned industrial by these amendments. It was also interesting to note that on Exhibit 7, in the area between the Delaware Lackawanna & Western Railroad right of way and Onondaga Lake, is the legend, “ Lands to be acquired for highway and park use. N. Y. State & County.” We are drawn inescapably to speculation as to whether subject land together with surrounding land east of said railroad and west of the lake was zoned Residential B in order to establish a more favorable potential development character in the imminent appropriation proceedings. (Cf. Matter of City of New York [West Side Renewal], 27 A D 2d 243.) If so, we would consider such a zoning ordinance as confiscatory in nature and a governmental effort to eventually appropriate property without just compensation. (See Scarsdale Supply Co. v. Village of Scars-dale, 8 N Y 2d 325; Chase v. City of Glen Cove, 41 Misc 2d 889.)
*745 Subject property was appropriated pursuant to section 30 of the Highway Law, as amended by chapter 797 of the Laws of 1953, which was entitled, ‘ ‘ An Act, In relation to the establishment of the Lake Onondaga West Shore Development”. The thrust of the amending law was twofold, i.e., to obtain land for highway purposes which would more adequately connect the City of Syracuse with the New York State Thruway in this location; and, to obtain for the County of Onondaga lands to be utilized for park purposes along the west shore of Onondaga Lake. An examination of the amending statute and Exhibit 7 indicates to this court that the State never intended to use subject property for highway purposes but intended to make it available for park purposes for the County of Onondaga. Our thoughts along this line seem to be borne out by our view of subject property which was in the same physical condition in January, 1967, as it was in January, 1955. We further noted that the State’s improved highway does not come close to subject property which was declared surplus by the Department of Public Works and conveyed on September 21, 1960, to the County of Onondaga. Such conveyance was made pursuant to sections 30 and 34 of Public Lands Law. On a reading of said statutes one must draw the conclusion that the Legislature was referring to lands which the State had owned for a substantial period of time; lands which it had acquired either for a specific public purpose of the State or whose ownership had devolved upon the State pursuant to the various methods outlined in said statutes; and, which public purposes had either been essentially abandoned by the State or that the land was no longer required for a continuing public purpose and was surplus. It is our opinion, that chapter 797 of Laws of 1953, which premeditated taking too much land for the State’s avowed public highway purpose and permitted the State to convey out such for a speculative future public park purpose, flouts section 7 of article I of the Constitution of New York. We not only deem it highly improper but also question the constitutionality of the State using the power of eminent domain to bank property for a future speculative use.
We believe the decision in Winkelman Co., v. State of New York (17 Misc 2d 418, mod. 10 A D 2d 894) is of interest on the above as it relates to the fact situation found by Judge Major,. Said company had contracted to construct the highway which the State seeks to relate to this appropriation. It then contracted with claimant herein to purchase fill from subject property for use in this highway project. The lower court pointed out (p. 420) that the specifications stated: “‘All borrow pits outside *746 the highway shall he acquired by the contractor at his own expense, and no borrow shall be made on or within three hundred feet of the right of way without written permission of the engineer. * * * ’ The evidence is devoid of any intent of removing the fill from within the area of 300 feet of the State’s right of way.” On page 421 of said decision Judge Major stated: “ On June 7,1954, the State’s engineer wrote claimant acknowledging letter of June 3, 1954 and prints of grading plan of the proposed borrow pit and further stated: ‘ Chapter 797 of the Laws of 1953 provides for the acquisition of these properties [one being the claimant herein] for development purposes relating to the Lake Onondaga West Shore Development. ’ ” (Material in brackets added. Emphasis added.)
The Judge then went on to write that: “ It is very evident the State’s engineer had no objection to the use of the sites in question before the contract was signed. 'His reluctance to approve developed * * * after taking thé matter up with the Onondaga County Park Board secretary. There is no evidence that the secretary knew the details of claimant’s agreement to grade and drain the properties. The grading of such borrow site properties could very well have been more advantageous * * * especially for parking.” (Emphasis added.)
In our opinion, the above substantiates our opinion that the State never intended to use subject property for highway purposes ; as in fact it did not. Obviously, if Onondaga County had appropriated subject property at about the time it intended to utilize it for park purposes, which time apparently still lies in the future, said property would have benefitted by a significant increase in value. The inequities of the situation are graphically pointed up by the State’s “XVI Conclusion of Law,” which, generally speaking, correctly states the condemnation law on comparable sales as follows: “Asa matter of law, sales situated on highways or service roads which were built as part of the same highway project for which the subject area was appropriated cannot be considered or used as comparable sales.” Thus by lumping together in one statute a present public highway use and a future public park use, the State seeks to prevent the landowner from obtaining fair market value predicated upon the proximity of her land to an important interchange of the New York State Thruway. As we consider that subject appropriation had no relation to said highway appropriation, we believe it proper to consider sales for industrial purposes in this area in relation to subject’s fair market value before the appropriation. We also believe that the situation presented in this claim fits, to some extent, within the doctrine set forth in Andrews v. State *747 of New York (19 Misc 2d 217, affd. 11 A D 2d 599, affd. 9 N Y 2d 606, 608): “The valuation of the property for that purpose included an element of value enhanced by the existence of the original project, but under the ruling1 in United States v. Miller (317 U. S. 369) this is to be compensated where, as here, the project is subsequently enlarged by the-construction of transmission lines, in which event the Miller case requires payment of the market price as enhanced by the factor of proximity to the public improvement.” In subject claim the Thruway exit was opened in June, 1955 and the contract to construct the new access and service roads was accepted by the State on December 20, 1955. (See Winkelman Co. v. State of New York, 17 Misc 2d 418, 423, supra.) Obviously, such timing would have indicated to prospective buyers, well before January, 1955, that this property was going to be in a strategic location relative to Interchange 39 of the Thruway. As the State’s appraiser said on page 5 of his appraisal: “ Several business concerns constructed buildings in this area, having been influenced by the access to New York State Thruway through Interchange No. 39.” It is common sense that as the Thruway was built it become obvious where the interchanges were to be constructed. We doubt that even the most pessimistic real estate buyer would consider that a Thruway interchange was going to end in a cow path. Therefore, we believe it almost impossible to determine whether the Thruway, which was not part of this appropriation, caused the increase in value or the new access road. We think it fair and equitable to find that this property’s value was enhanced because of the proximity to the Thruway. We also think that the comparable sales used by claimant, particularly those close in time to 1955, reflected to some degree a measure of this enhanced value.
Having established that the existing zoning in 1955 permitted an industrial use, claimant was faced with the accessibility of the property for an industrial use. The State did not raise the question of farm access at the first trial and, in fact, apparently did not develop its legal posture on this point until a day or two before the second trial. We arrive at this conclusion because the State’s appraiser came to the second trial with the same appraisal, which was predicated on a residential highest and best use; and, all of the State’s comparable sales related to such a use. However, at the trial the State proved that claimant’s access was no greater than a farm crossing from Van Vleck Road. Apparently when claimant’s predecessor in title conveyed the fee to the railroad, he did not reserve any access to this otherwise landlocked parcel. Claimant contended that such a *748 right of way was development by prescription against the railroad. The State contended that such right of way was created by section 52 of the Railroad Law, which has provided for such farm crossings since the late 1800’s. (See Jones v. Seligman, 81 N. Y. 190.) We do not consider the question of how claimant’s farm crossing was established to be of importance. Certainly it could be created by prescriptive right (Jenkins v. New York Cent. R. R. Co., 1 A D 2d 57) or by section 52 of the Railroad Law. In our opinion, it was in this case created by said section 52 of the Railroad Law for farm purposes. The important fact is the use made of the land reached over the easement. If such land had been openly, notoriously and uninterruptedly used for the required period of time, for industrial purposes, then the claimant would have established a prescriptive right of way across said railroad for said purpose, and this would have increased or changed the statutory right created by section 52 of the Railroad Law. As stated in Prentice v. Geiger (74 N. Y. 341, 347): “ the prescriptive right is confined to the right as exercised for that period of time.” (See, also, Taylor v. State of New York, 302 N. Y. 177; Lewis v. New York & Harlem R. R. Co., 162 N. Y. 202, 225; Jenkins v. New York Cent. R. R. Co., 1 A D 2d 57, supra.) The proof before this court, however, was that claimant’s land was used for at least 35 years for farm purposes. Thus, on the present state of the record, we must hold that the claimant’s right of way from Van Vleck Road across said railroad tracks was restricted to a farm use. We would think the reasonable probability, if any, of obtaining a private agreement from the railroad to increase the crossing user from farming to industrial would be a subject of proof. None was presented, possibly because the objection was not raised at the first trial and the State’s comparable sales served before this trial reflected a claimed residential use. If the State had presented farm sales, we would consider the record closed at this point. However, as the State did not do so, we cannot arrive at an award which would not be subject to reversal for lack of probative evidence on value, the exact reason for reversal when this claim was previously tried. Therefore, in the interest of justice pursuant to paragraph 8 of section 9 of the Court of Claims Act, we direct that the trial be reopened for testimony on (1) farm value, predicated on comparable sales, and damage; and, (2) the practice of railroad companies, particularly the company in ownership of this right of way, relative to the possibility of an increased user by private agreement from farm use to industrial use of land adjacent to railroad tracks. We will take whatever additional evidence the parties desire to submit in *749 these regards, and only these regards, at a session of the Court of Claims to be held in the Court of Claims courtroom, in the State Office Building, in the City of Syracuse, on June 5,1967 at 9:30 a.m.
Claimant contended that, because of the long interval of time between the date of filing of the appropriation map, i.e., January 6,1955, and personal service of said map, i.e., December 7, 1959, she was entitled to interest on the award from January 6, 1955 to December 7,1959. We reserved decision on this motion. We now deny such motion under the authority of LaPorte v. State of New York (6 N Y 2d 1). (See, also, Walker v. State of New York, 15 Misc 2d 4.) Claimant is entitled to interest for the six-month period commencing with January 6, 1955 and the period after December 2,1961 to entry of judgment herein.
Claimant requested the court to take judicial notice of the decision in Winkelman Co. v. State of New York (17 Misc 2d 418, supra), which we did; and, to reproduce in this record the testimony of an expert witness in that trial relative to the amount of borrow which the Winkelman Company could have removed from claimant’s property. Said witness was not available to the claimant herein and her counsel sought to justify such procedure under the rule of Fleury v. Edwards (14 N Y 2d 334). Although the State was a party to the Winkelman trial, with full rights to cross-examination in that contract claim, we did not believe the fact situation warranted our application of the Fleury rule to subject claim. The claimant’s land was intact in January, 1967, and claimant could easily have obtained expert testimony relative to the gravel or borrow deposits to present in this trial. If, however, the claimant’s land had been destroyed before her counsel could have reasonably developed such expert testimony, we believe such prior testimony would have been admissible in this trial. The point becomes academic in this trial, as claimant’s expert appraiser did not seek to testify to the enhancing value of gravel or borrow deposits (Matter of Huie, 1 A D 2d 500); and, this prior expert testimony was proffered after said appraiser had completed his testimony.