## No. 23846.

Board of County Commissioners of Eagle County, and The Department of Highways, State of Colorado *v.* Vail Associates, Ltd., Western Federal Savings and Loan Association, Denver U. S. National Bank, H. A. D. Enterprises, Inc., Virgil H. Williams as Treasurer and Public Trustee of Eagle County.

(468 P.2d 842)

Decided April 6, 1970. Rehearing denied June 1, 1970.

GENE K. LUBY, for plaintiff in error Board of County Commissioners of Eagle County.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE, Deputy, JOSEPH M. MONTANO, Assistant and Chief Highway Counsel, GEORGE D. DIKEOU, Assistant, LEONARD RIPPS, Assistant, for plaintiff in error The Department of Highways, State of Colorado.

WINNER, BERGE, MARTIN and CLARK, FRED M. WINNER, for defendant in error Vail Associates, Ltd.

CLANAHAN, TANNER, DOWNING AND KNOWLTON, for defendant in error Western Federal Savings and Loan Association.

DAVIS, GRAHAM AND STUBBS, L. RICHARD FREESE, JR., for defendant in error Denver U.S. National Bank.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

This writ of error is directed to an eminent domain proceeding in the District Court of Eagle County, Colorado. The Board of County Commissioners of Eagle County and the Department of Highways, State of Colorado, petitioned to acquire by the exercise of the power of eminent domain a strip of land containing approximately 129 acres owned by respondent Vail Associates, Ltd. We herein refer to petitioners as the "State" and to to respondent as "Vail."

The right-of-way being acquired was for the purpose of constructing a portion of U. S. Interstate 70 in the Gore Creek Valley which runs westerly from the west side of Vail Pass to Dowd Junction at the intersection of U. S. Highways Nos. 6 and 24. I-70 was to replace U. S. 6. Vail's lands in Gore Valley, which consisted of approximately 1,125 acres, were bisected by U. S. 6. The portion lying south of U. S. 6 had been developed into a ski resort known as Vail Village. The core of the Village development consisted of approximately eighty acres from which the ski lifts ascended southward into the Mill Creek area of the White River National Forest. The initial development of Vail Village and the adjoining ski area commenced during the early part of 1962. By the time of the trial in November of 1967, the development was a thriving ski resort. A variety of ski slopes had been created and were serviced by 9 ski lifts installed at a cost of approximately two million dollars. It was anticipated that when the ski area was fully developed a total of 20 ski lifts would have been installed.

Vail Village is a municipal corporation. It consists of numerous commercial enterprises, including shops, restaurants, hotels, motels, lodges, condominiums and individual residences, the construction cost of which was estimated to be from $27,000,000 to $29,000,000. Utility

services for water, sewer, electricity and gas were available, as were fire and police protection. To the end that the area would develop into a year-round recreation resort, the Vail Metropolitan Recreation District was formed and had commenced construction of an 18-hole golf course, tennis courts and other summer recreation facilities. In sum total, the evidence showed a vital, thriving and growing community with great promise of significant additional expansion in the future. The State expert appraiser, in describing the successful manner in which the Vail ski area had been developed, characterized the management and general procedures followed by Vail Associates in the operation of the ski area and in planning for the future as outstanding. It is in this setting that the State, in the interest of constructing another segment of I-70 across the State of Colorado, exercised its power of eminent domain.

The property of Vail lying north of U. S. 6 was undeveloped, raw land; and it was through this area that I-70 was to be constructed. An arrangement had been worked out between the State and Vail that the portion of U. S. 6 lying outside of the I-70 right-of-way no longer needed for highway purposes would revert to Vail upon completion of I-70 through the Gore Valley area. This reversion consisted of approximately sixteen acres.

Although the condemnation proceedings were conducted before a commission of three freeholders, the court presided throughout the entire trial, ruling upon all issues and reducing the role of the commissioners to that of a jury.

Witnesses for both Vail and the State agreed that the highest and best use of the property being condemned was for an extension of the Vail ski area resort. Vail's evidence showed plans for the future development of a new ski area to be known as Lion's Head, which lay to the west of the existing Mill Creek area. Included in the development plans were the installation of additional ski lifts from the base of the Lion's Head area upward to

new ski trails which eventually would be interconnected with the older development lying to the south and east. The plan envisioned a new commercial development radiating from the base of the new ski lifts, which would include uses similar to those existing in the Vail Village area. These plans were preliminary projections of the thinking of Vail as to the best utilization of the Lion's Head area; but in no sense of the word could they be considered finalized. No platting of this area had been accomplished, nor had streets been laid out or dedicated, nor had final engineering been undertaken or completed. Vail contended that there was an agreement with the State that Vail would deliberately postpone final planning, subdividing, and engineering until such time as the State definitely determined the route of I-70. The State disputed any such agreement. In any event the land over which I-70 was to cross was undeveloped and unplatted land.

The expert appraisers for both the State and Vail used the comparable sales approach, or market data approach. The appraisers disagreed sharply in their valuations. Vail's most generous appraiser placed the fair market value of the land taken at $1,508,000, or approximately $11,600 per acre, and the value of the U. S. 6 reversion at $363,000, or approximately $22,700 per acre; whereas the State expert was of the opinion that the taking was worth only $332,000, or approximately $2,570 per acre, and the reversion was worth $35,195, or approximately $2,000 per acre. The award of the commission was $1,378,096 for the taking, at the rate of about $10,930 per acre, and $335,694 for the reversion, at the rate of approximately $20,970 per acre.

The State contends prejudicial error was committed in several respects relating to the admission of evidence and, therefore, the commission's certificate of ascertainment and assessment should be set aside and the cause remanded for a new hearing. We agree, and discuss the specifications which we deem significant.

## I.

The first contention relates to evidence consisting of two exhibits. The first, exhibit 17, depicted a hypothetical division of Vail's raw, undeveloped land into small areas or plots divided by hypothetical roads or streets. This exhibit was designed as "Vail Village Lion's Head Land Use Plan." It had been prepared by Vail's land planning consultant and represented the contemplated Lion's Head development heretofore discussed. It graphically depicted the highest and best use of this area, according to the testimony of Vail's witnesses. To each hypothetical plot was ascribed a certain land use, including such uses as for a shopping center, motels, lodges and apartments, highway services, condominiums, parking, medium-high density residential and hillside residential, etc.

The second exhibit, No. 18, captioned "Vail Village Land Take and Reversion — Summary by Land Use and Location," showed the right-of-way being condemned. On it were the hypothetical land uses as depicted on exhibit 17, traversed by the right-of-way. The amount of acreage being taken from each hypothetical use plot was set forth. For example, of the proposed shopping center use, exhibit 18 indicated the right-of-way took 3.186 acres; of the motel and highway services use, the right-of-way took 9.681 acres; etc. In addition, exhibit 18 showed land uses and acreages taken from each use in the eastern part of Gore Creek Valley, which were not shown on the Lion's Head Land Use Plan.

Vail's appraiser, Bresnahan, testified that in his opinion, considering the highest and best use as shown by exhibits 17 and 18, the total taking was worth $1,508,000. On cross-examination he indicated that he arrived at this figure by assigning a present market value per acre to each type of hypothetical use. He then determined how many acres of the particular use were being taken and multiplied the acreage by the hypothetical value assigned to that use. This figure was added together with those determined by this method for all other hypothetical use

acreages taken, in order to arrive at the total market value of the right-of-way being condemned.

■■■ We here note that neither the court nor counsel had the benefit of our decision in *Department of Highways v. Schulhoff,* 167 Colo. 72, 445 P.2d 402, the announcement of which was made after this case was tried. The State contends that the use of exhibits 17 and 18 and the testimony of Vail's appraiser, which assigned hypothetical use values to the use areas designated on the exhibits in order to arrive at the total value, is prohibited by the rule announced in *Schulhoff.* It is fundamental that evidence of the highest and best use to which the property may reasonably be applied in the future by men of ordinary prudence and judgment is admissible to assist the commission or jury in arriving at the present cash market value of the property being taken. *Wassenich v. City of Denver,* 67 Colo. 456, 186 P. 533. Concerning the admission of the exhibits, we do not find any abuse of discretion in permitting the use of such exhibits to graphically illustrate and demonstrate the expert's opinion of the highest and best uses of the condemned property. We do not consider such to be forbidden by *Schulhoff.* The admission of such exhibits should be governed by the general rules relating to the use of demonstrative evidence. *McGovern v. Commissioners,* 115 Colo. 347, 173 P.2d 880; *Barnes v. North Carolina State Hwy. Comm.,* 250 N.C. 378, 109 S.E.2d 219; *United States v. Coronado Beach Co.,* 255 U.S. 472, 41 S.Ct. 378, 65 I.Ed. 736.

■■ However, *Schulhoff* expressly forbids the use of the method of valuation employed by Vail's appraiser. "Each of the appraisers agreed in the trial court that the highest and best use of Parcel No. 320 was for subdivision into residential building sites. The Schulhoffs' appraisers, however, were permitted to arrive at their opinions of the fair market value of Parcel No. 320 by hypothetically carving it up into residential building sites, estimating the value of each site, and then adding the estimated values of all the sites together. The State contends that

this method of evaluation was improper and highly speculative. We agree and hold that the error in admitting such evidence was prejudicial." *Schulhoff, supra.*
We find no substantial difference in adding the individual values of *building sites* to arrive at a total value, than, as was done here, in adding together individual values of *use areas* as shown on exhibits 17 and 18 to arrive at a total value. The measure of compensation is not the aggregate of values of individual plots into which the tract taken could best be divided, but rather the value of the *whole tract* as it exists at the time of the condemnation, taking into consideration its highest and best future use. *Department of Highways v. Schulhoff, supra;* 4 *Nichols, The Law of Eminent Domain* § 12.3142[1] (3d ed. rev. J. Sachman 1962). A departure from the rule of *Schulhoff* would permit undue consideration by a commission or jury of speculative or prospective values based upon assumed future uses of the property being condemned. *Wassenich v. City of Denver, supra.* We hold that the opinion evidence of Vail's appraiser was rendered incompetent by reason of the method by which he arrived at his total valuation of the taking.

## II.

We further find that prejudicial error was committed in permitting the commission to hear and consider evidence of the sales of subdivided sites in Vail Village. It is quite apparent from the record that Vail's experts relied on these sales to bolster their estimate of value placed upon the respective use areas shown on exhibits 17 and 18, the total of which constituted their opinion of the value of the taking. One of Vail's appraisers, Mr. Bresnahan, stated, "I relied very much on a composite of the commercial sales, with the projection that a person, typical buyer that would buy the land that is in question here in this case, would know what he could eventually realize from the purchase of this land."

It is entirely permissible to show prices paid for other lands, provided the lands are similar in locality

and character, and the sales are not too remote in point of time. It follows that when other so-called comparable sales are so dissimilar in respect to either locality, character of the lands involved, or remoteness in time, such other sales may not be shown and evidence thereof is incompetent and inadmissible. Whether such sales are sufficiently similar to be of probative value in aiding the fact finder in fixing the value of lands being taken is for the trial court to determine in the exercise of its sound discretion. *Schulhoff, supra; Epstein v. City of Denver,* 133 Colo. 104, 293 P.2d 308, 55 A.L.R.2d 783; *McNulty v. Bobson,* 117 Colo. 336, 187 P.2d 590; *Wassenich v. City of Denver, supra.*

■ Vail's appraiser, Bresnahan, testified to 13 comparable sales of undeveloped, raw land in the Gore Creek Valley, all occurring within five years of the condemnation, and varying in size from 7.84 acres to 135 acres. All of these sales met the tests of comparability as to locality, character, and proximity in time. The price ranged from $700 per acre for the 135-acre tract to a high of $5,000 per acre for a 20-acre tract. However, the appraiser was then allowed, over objection, to testify concerning 23 sales of subdivided commercial, motel, lodge and condominium sites within Vail Village, which varied in size from a minimum of 294 square feet to a maximum of 99,273 square feet (2.279 acres). These sites sold for prices ranging from a low of $1.50 per square foot ($65,340 per acre) to a high of $5 per square foot ($217,800 per acre). In our view these sales of subdivided sites were clearly not comparable to the land being taken, because of the obvious differences in size, character, and development, and evidence as to such sales under the circumstances of this case was incompetent and inadmissible. *Schulhoff, supra; Southern Electric Generating Co. v. Liebacher,* 269 Ala. 9, 110 So.2d 308; *Waukegan Park District v. First National Bank of Lake Forest,* 22 Ill. 2d 238, 174 N.E.2d 824; *Forest Preserve District of Cook County v. Eckhoff,* 372 Ill. 391, 24 N.E.2d 52; *City of St.*

*Louis v. Kisling,* 318 S.W.2d 221 (Mo.); *State Road Commission v. Ferguson,* 148 W.Va. 742, 137 S.E.2d 206. There may be situations where resort to the use of sales of subdivided sites is necessitated by a lack of comparable sales of undeveloped raw lands. However, such rule of necessity is not applicable here where there were available for comparison purposes thirteen comparable sales of undeveloped raw lands in the Gore Creek Valley.

## III.

 The State further contends that prejudicial error occurred when the trial court permitted the use of a sale the price of which was enhanced by reason of the improvement being undertaken by the State, here the construction of an interchange on I-70. The particular sale was of a 3.22-acre parcel located at the southwest corner of one of the I-70 interchanges. This parcel was purchased by the Vail HI (Holiday Inn) after the project had been announced and the plans for this improvement had been finalized. We agree that this sale included an enhancement of land value as a direct result of the highway improvement and, therefore, it becomes dissimilar for comparison purposes. A landowner is not entitled to recover an increase or enhancement in value of his land caused by the proposed improvement for which his land is being taken. *Williams v. Denver,* 147 Colo. 195, 363 P.2d 171. Nor should a landowner be entitled to indirectly increase the value of his land being taken by comparing it with a sale of other land the value of which has been enhanced by the public improvement contemplated. *Denver v. Smith,* 152 Colo. 227, 381 P.2d 269; *Redfield v. Iowa State Highway Commission,* 252 Iowa 1256, 110 N.W.2d 397; *Zogby v. State,* 53 Misc. 2d 740, 279 N.Y.S.2d 665; *Latham Holding Co. v. State,* 16 N.Y.2d 41, 209 N.E.2d 542, 261 N.Y.S.2d 880.

## IV.

 As heretofore noted, the proceedings were conducted before a commission of three freeholders. The trial judge presided over the entire hearing, treating the

commission in effect as a jury. Our statutes contemplate that in the absence of a request for a jury trial, eminent domain proceedings shall be conducted by a commission of three freeholders appointed by the court. C.R.S. 1963, 50 1-1, 6(1) and (2). It is not required that the trial judge preside at all of the meetings of the commission. Specifically, the duties of the court, in the absence of a jury, are initially to appoint the commissioners, administer the oath of office to them, fix the time and place of their first meeting, instruct them in writing as to their duties and, at the conclusion of the testimony, instruct them in writing as to the applicable and proper law to be followed by them in arriving at their ascertainment. The court shall upon request "* * * make rulings upon the propriety of the proofs and objections of the parties. * * *" It was not the intent of the statute that the judge of the court should preside over the commission proceedings in the same manner as he is required to do in a jury trial. Although this matter was not raised as error by either of the parties, we deem it advisable to direct attention to the specific duties enumerated in the statute in order that trial judges, faced with a series of eminent domain proceedings arising out of a continuing public works project such as the construction of I-70 across the state of Colorado, will not feel compelled to devote their entire time and attention to such proceedings to the exclusion of the ordinary business of the courts.

In view of our discussion hereinabove, we deem it unnecessary to consider any further alleged errors asserted by the State.

The certificate of ascertainment and assessment of the commission is hereby set aside and the cause remanded for a new trial consonant with the views expressed herein.

Mr. Chief Justice McWilliams and Mr. Justice Groves dissenting.

Mr. Justice Pringle not participating.

Mʀ. Justice Groves dissenting:

I respectfully dissent from the conclusion expressed in the majority opinion that the testimony of the appraiser, Bresnahan, was violative of the decision in *Department of Highways v. Schulhoff*, 167 Colo. 72, 445 P.2d 402. The *Schulhoff* case involved a tract of land slightly more than three quarters of an acre in size. As stated in the majority opinion, Schulhoff's appraisers were permitted to arrive at their opinions by hypothetically carving the tract into residential building sites, estimating the value of each site, and then adding the values of all sites.

In *Schulhoff*, this court stated:

"It is the duty of the jury to find and allow no more than the present market value, no matter what the future prospects may be, and this character of evidence may be considered only for the purpose of ascertaining the market value at the time of the trial. After considering any and all reasonable uses to which the property may be put in the future, the question is, taking all things into consideration, what is the present market value, not what will or may be its value later on account of some use to which it may be put in the future."

\* \* \*

"Valuation must be based on what a willing purchaser will pay for the whole at the time of the taking and not what a number of purchasers might be induced to pay in the future for the land in smaller parcels."

\* \* \*

"Evidence of the price paid for similar property in a voluntary sale is admissible on the question of value of the property condemned, provided the properties sold are similar in locality and character to the property in question and not so far removed in point of time to make a comparison unjust or impossible."

The instant matter involved a long, narrow strip of land containing 128.727 acres. This land was raw and undeveloped, but substantial portions of it were located across

the road from a number of established land use areas. Land in different areas had different values. On direct examination Mr. Bresnahan testified that in his opinion the entire strip of land, in its raw and undeveloped state, had a value of $1,508,012.75. Bresnahan also testified concerning 13 comparable sales of undeveloped, raw land and 23 sales of subdivided commercial tracts. He explained that in evaluating a tract such as the one involved, one should separate it into land use areas comparable to those across the road from the various segments of the strip, and that by reason of location and nearby use, the different segments should be assigned different values.

After these matters had been elicited, Mr. Bresnahan testified that, in reaching his valuation of the various segments, he considered all of the above sales of land as though they were without improvements and that, "these sales are all based on vacant ground." Primarily, his valuations were based upon value per acre.

This mode of valuation seems both logical and reasonable. The land taken is adjacent to a large development, which is continuing to develop. Appraisers could reach the conclusion that the development would continue into adjacent lands and the jury should be allowed to consider testimony pro and con in this respect. As I read the testimony of Mr. Bresnahan, he was expressing an opinion as to what a willing buyer would pay a willing seller for this long, narrow strip containing nearly 129 acres. If I am correct, then it follows that the jury was entitled to consider his testimony and assign it such weight as they deemed proper. This is a far cry from the *Schulhoff* prohibition against a hypothetical subdivision of the property into lots and then projecting a value at which each of the lots might sell.

I am authorized to state that MR. CHIEF JUSTICE MCWILLIAMS joins in this dissent.