**MERRILL LYNCH COMMODITIES INC., Plaintiff,**

**v.**

**RICHAL SHIPPING CORPORATION and Aristidis I. Alafouzos, Defendants,**

**v.**

**MERRILL LYNCH INTERNATIONAL BANK (PANAMA) and Merrill Lynch, Pierce, Fenner & Smith (Hellas) Ltd., Counterclaim Defendants.**

No. 82 Civ. 8226 (JMC).

United States District Court, S.D. New York.

Feb. 21, 1984.

934

Rogers & Wells, New York City (William F. Koegel, Joseph A. Post and Peter L. Thoren, New York City, of counsel), for plaintiff and counterclaim defendants.

Haight, Gardner, Poor & Havens, New York City (John J. Reilly, Sheila T. Cain, Barbara A. Ritomsky, New York City, of counsel), for defendants.

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

Plaintiff's and third-party defendants' motions for a stay of this action pending arbitration and for an order compelling parties to proceed to arbitration are granted. 9 U.S.C. §§ 3, 4.

Plaintiff's and third-party defendants' motions for a protective order and an order dismissing counterclaims against third-party defendants are denied without prejudice. Fed.R.Civ.P. 26(c); 12(b)(2), (6).

## FACTS

On July 26, 1982, defendant Richal Shipping Corporation ["Richal"], a Liberian corporation with its principal place of business

in Athens, Greece, executed a Commodity Account Agreement in connection with Account No. 152–08075 ["075 Account"], with plaintiff Merrill Lynch Commodities Incorporated ["MLC"], a Delaware corporation with its principal place of business in New York. The parties agreed to arbitrate their disputes pursuant to an arbitration agreement signed on behalf of Richal by Aristides I. Alafouzos ["Alafouzos"], a Greek citizen.[1] Alafouzos also executed a Continuing Guaranty with respect to the 075 Account on July 26, 1982 that provided in part: "This shall be a continuing Guaranty for such indebtedness which [Richal] shall incur to you, in accordance with the rules and customs of any exchange upon which [its] orders are executed and in accordance with any special agreements now or hereafter existing between you and [Richal]."

Richal used the 075 Account to engage in foreign exchange transactions. On October 6, 1982, MLC liquidated the 075 Account as a result of Richal's refusal to meet new margin demands requested by MLC. A debit balance of $1,062,820.40 remaining in the 075 Account after its liquidation was offset on November 5, 1982 by a transfer of $1,000,000 to MLC from a Richal account maintained for the benefit of MLC with Merrill Lynch International Bank Ltd. ["MLIB"]. By letter dated November 16, 1982, MLC served an arbitration demand upon Richal. By letter dated December 3, 1982, Richal elected arbitration under the rules of the American Arbitration Association but maintained that Alafouzos was not a party to the arbitration agreement and that the foreign currency transactions were not within the scope of the agreement. By letter dated December 6, 1982, MLC claimed that Richal failed to comply with selection provisions of the arbitration agreement and instead, elected arbitration pursuant to the rules of the New York Stock Exchange.

Three lawsuits have been instituted between the parties. On October 8, 1982, Richal commenced proceedings against Merrill Lynch, Pierce, Fenner & Smith (Hellas) Ltd. in the Greek courts. Following a hearing, the action was dismissed on January 11, 1983. A second lawsuit was commenced by Richal against MLIB on November 17, 1982 in British courts which is still pending. The instant action was commenced by MLC against Richal and Alafouzos on December 10, 1982 seeking recovery of the $62,820.40 debit balance remaining in the 075 Account which was not offset by the MLIB transfer. Defendants have counterclaimed for damages arising from the liquidation of the 075 Account.

On May 17, 1983, the Commodity Futures Trading Commission ["CFTC"] amended its arbitration regulations to become effective on August 15, 1983. On August 8, 1983, MLC sent Richal a notice which provided for a revised arbitration agreement that incorporated the CFTC amendments.[2] The section that set out the proposed arbitration terms included the following provision:

If you signed the Arbitration Agreement when you opened your account and wish to be bound by the terms of this new agreement you need not respond to this notice. If, however, you signed the Arbitration Agreement before and DO NOT wish to be bound by the terms of this new agreement, sign the form below and return it in the enclosed envelope

---

**1.** The arbitration agreement, dated July 26, 1982, provides that:

Any controversy arising out of or relating to my account, to transactions with you for me or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the contract market upon which the transaction giving rise to the claim was executed or the New York Stock Exchange, Inc. as as [*sic*] I may elect. If I do not make such election by registered mail addressed to you at your main office

within five days after demand by you that I make such election, then you make such election. Judgment upon any award rendered by the arbitrations may be entered in any court having jurisdiction thereof.

**2.** The notice was sent by Merrill Lynch Futures, Inc., the recently adopted name of plaintiff Merrill Lynch Commodities, Inc. ["MLC"]. Because plaintiff changed its name after the commencement of the action, the Court will continue to refer to plaintiff as MLC.

within 30 days. By doing so, you will not only reject the new agreement, you will not be subject to or bound by the former agreement which will be null and void as of August 15, 1983. Your failure to respond within 30 days will be presumed as an indication that you accept the terms of the new agreement and agree to be bound by it (emphasis in original).

On September 1, 1983, Richal and Alafouzos elected not to be bound by the new arbitration provisions and now maintain that the original arbitration agreement is null and void *ab initio*. MLC asserts that the notice applied only to "new" arbitration agreements or to those accounts in which a previous arbitration agreement had not been invoked as of August 15, 1983.

## DISCUSSION

### 9 U.S.C. § 3 ["Section 3"]

 This Court is empowered under Section 3 of the Federal Arbitration Act [the "Act"] to stay proceedings when issues are referrable to arbitration pursuant to a written agreement.[3] *See Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 201, 76 S.Ct. 273, 275, 100 L.Ed. 199 (1956); *Ocean Industries, Inc. v. Soros Associates International, Inc.*, 328 F.Supp. 944, 947 (S.D. N.Y.1971); *see also Paine Webber Jackson & Curtis, Inc. v. Chase Manhattan Bank, N.A.*, 728 F.2d 577 at 580 (2d Cir.1984) (arbitration of disputes not incorporated in a written agreement). Pursuant to Section 3 the Court may only consider (1) whether there exists an agreement to arbitrate and (2) its scope. *See Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967); *Netherlands Curacao Co. v. Kenton Corp.*, 366 F.Supp. 744, 746 (S.D.N.Y.1973). "The question of whether a dispute between the parties is covered by the arbitration agreement is for the courts to decide." *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 63 (2d Cir.1983).

It is not contested that an enforceable arbitration agreement existed at the time of the disputed transactions; rather, Richal argues that the issues raised by these transactions are outside the scope of the agreement. Richal maintains that it was misled as to the scope of the underlying Commodity Account Agreement covered by the arbitration agreement and contends that the 075 Account was not to be used for foreign currency transactions.[4]

 In deciding whether to stay this action, the Court must determine whether the arbitration clause is broad enough to include the claims made by MLC. *See United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *Coudert v. Paine Webber Jackson*

---

3. Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3 reads:

 If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

4. Defendants claim that they were "specifically led to believe that the Commodity Account Agreement and related documents signed by Richal on July 26, 1982 would not apply to foreign currency transactions." *See* Defendants' Memorandum of Law in Opposition to the Motions of the Plaintiff and the Counterclaim Defendants for a Protective Order, for a Stay Pending Arbitration and an Order Compelling Arbitration, and for an Order Dismissing Certain Claims at 11 (filed June 24, 1983) [hereinafter "Defendants' Memorandum in Opposition"]. The only facts supporting this contention are alleged statements made to Richal after trading on Account No. 152–08075 ["075 Account"] had commenced. *See* Declaration of Athanassios C. Tsoukalas, ¶ 13 (filed June 24, 1983). This contention is explicitly disputed by plaintiff, *see* Declaration of Alexander Moraitakis, ¶¶ 8, 13, 15 (filed Aug. 12, 1983) [hereinafter "Moraitakis Declaration"] and impliedly by defendants' counsel. *See* Affidavit of John J. Reilly, ¶¶ 2, 3 (filed Oct. 7, 1983).

& *Curtis*, 705 F.2d 78, 81 (2d Cir.1983).[5] The arbitration agreement covers "transactions" relating to Richal's "account". All transactions between MLC and Richal were based upon the contractual relationship entered into on July 26, 1982. It is evident that issues involving the foreign exchange transactions, regardless of whether they were made pursuant to the 075 Account or Account No. 152–08076 derive from this relationship.[6] For this reason, the Court finds that the claims at issue are within the ambit of the arbitration agreement and hereby stays this proceeding. *See Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 725 F.2d 192 at 195 (2d Cir. 1984).

*9 U.S.C. § 4 ["Section 4"]*

Under Section 4 of the Act, the Court is instructed to order arbitration to proceed upon being satisfied that (1) the making of the agreement for arbitration or (2) the failure to comply therewith is not in issue.[7] *See Prima Paint Corp. v. Flood & Conklin Manufacturing Co., supra*, 388

U.S. at 403, 87 S.Ct. at 1805; *Prudential Lines, Inc. v. Exxon Corp., supra*, 704 F.2d at 62 & n. 14. Defendants argue that their failure to arbitrate is in issue because the Commodity Account Agreement was allegedly limited to trading subject to the Commodities Exchange Act ["CEA"], 7 U.S.C. §§ 1–24 and that the currency transactions at issue are not regulated by the CEA.[8] This argument is without merit. Richal signed a Corporate Authorization to Trade Commodities ["Corporate Authorization"] empowering MLC to buy or sell commodities that did not refer to CEA regulations. The Corporate Authorization is clearly part of the July 26, 1982 agreements covered by the arbitration agreement. Foreign currency transactions are commodities transactions, *see CFTC v. American Board of Trade, Inc.*, 473 F.Supp. 1177, 1182 (S.D.N.Y.1979) and, therefore, are subject to the arbitration agreement.[9] Moreover, pursuant to Section 4 the Court is limited to determining only "whether a party refused to arbitrate, not whether it rightfully refused.... A

**5.** Courts liberally construe the scope of arbitration clauses. *See Coudert v. Paine Webber Jackson & Curtis*, 705 F.2d 78, 81 (2d Cir.1983); *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1212 (2d Cir.), *cert. denied*, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972).

**6.** *See* Moriatakis Declaration, ¶¶ 8, 11, 13. Defendants' contention that the foreign exchange transactions were conducted solely between Richal Shipping Corporation ["Richal"] and Merrill Lynch International Bank, Inc. ["MLIB"] and bypassed the 075 Account is clearly erroneous. *See* Defendants' Memorandum in Opposition at 17. Although MLIB was involved with Richal's foreign exchange transactions, it acted as a conduit to the currency markets by executing individual orders on behalf of MLC. *See* Affidavit of James H. Hohorst, ¶¶ 3–5 (filed Apr. 12, 1983). Richal's account at MLIB was opened for the benefit of MLC and the 075 Account. *See* Affidavit of William F. Koegel, ¶ 5 (filed Apr. 12, 1983).

**7.** Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4 provides in pertinent part:
A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have

jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure.
The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

**8.** *See* Defendants' Memorandum in Opposition at 15–17.

**9.** Defendants allege that Commodities and Exchange Act ["CEA"] regulations affecting the 075 Account can be inferred from the Commodity Account Agreement. Assuming *arguendo* that CEA regulations applied to the 075 Account and that the foreign currency transactions are outside the ambit of the CEA, *see* 7 U.S.C. § 2, the arbitration agreement would still apply to the transactions. *See Shearson Hayden Stone, Inc. v. Scrivener*, 671 F.2d 680, 684–85 (2d Cir.1982).

contrary conclusion, permitting the court to evaluate the 'rightfulness' of a party's refusal to arbitrate, would be at odds with the limited scope of judicial inquiry authorized by section 4." *Conticommodity Services v. Philipp & Lion,* 613 F.2d 1222, 1227 (2d Cir.1980) (citations omitted); *see Trafalgar Shipping Co. v. International Milling Co.,* 401 F.2d 568, 572 (2d Cir. 1968).[10]

In the instant dispute, there is (1) no claim of fraud in the inducement or (2) any other factual issue concerning the existence of an arbitration agreement. *See Prima Paint Corp. v. Flood & Conklin Manufacturing Co., supra,* 388 U.S. at 406, 87 S.Ct. at 1807. Having determined the existence of the arbitration agreement and a failure to comply therewith, the Court orders the parties to proceed to arbitration.

*CFTC Amendments*

Defendants argue that the arbitration agreement is invalid because it does not comply with the August 15, 1983 amendments to CFTC arbitration regulations. Although the arbitration agreement, the dispute, the request to arbitrate and the instant motion predate the amended regulations, defendants rely on *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 622 F.2d 216 (6th Cir.1980), *aff'd,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) and *Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 567 F.2d 1174 (2d Cir. 1977), to support the argument that the CFTC amendments are retroactive.

■ The CFTC regulations at issue were promulgated pursuant to 7 U.S.C. § 7a(11), which limits the foreign currency transactions it governs to those involving sales "for future delivery conducted on a board of trade." 7 U.S.C. § 2.[11] There is no dispute that the transactions at issue are forward rather than future transactions, *see SEC v. G. Weeks Securities,* 483 F.Supp. 1239, 1244 (W.D.Tenn.1980), *modified on other grounds,* 678 F.2d 649 (6th Cir.1982), and were not conducted on a board of trade.[12] Clearly, if the transactions do not need to comply with CEA requirements, then the controlling arbitration agreement is not affected by CFTC regulations. *See Shearson Hayden Stone, Inc. v. Scrivener,* 671 F.2d 680, 684–85 (2d Cir.1982). Because the transactions were not within the scope of the CEA, the arbitration agreement remains valid and enforceable.

■ Assuming *arguendo* that CEA jurisdiction existed, the Court would not give retroactive effect to the CFTC amendments. The instant dispute varies significantly from situations where CFTC amendments have been retroactively applied. *See Curran v. Merrill Lynch, Pierce, Fenner*

---

**10.** Defendants also maintain there are disputed issues of fact concerning the making of the arbitration agreement. Relying on *A/S Custodia v. Lessin International, Inc.,* 503 F.2d 318 (2d Cir.1974) and *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673 (2d Cir.1972), defendants assert an evidentiary hearing is required before the Court can compel arbitration pursuant to 9 U.S.C. § 4. Defendants' contention is misplaced. "[A] federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967); *see Manes Organization, Inc. v. Standard Dyeing and Finishing Co.,* 472 F.Supp. 687, 690 n. 4 (S.D.N.Y.1979). In *Interocean Shipping Co. v. National Shipping & Trading Corp., supra,* 462 F.2d 673, the Second Circuit directed that in order to prove a genuine issue of fact with respect to an arbitra-

tion agreement, a party must make "an unequivocal denial that the agreement had been made" and produce evidence to substantiate the denial. *Id.* at 676 (quoting *Almacenes Fernandez, S.A. v. Golodetz,* 148 F.2d 625, 628 (2d Cir.1945)). Moreover, the Supreme Court has described such an issue as one where a party was fraudulently induced to enter the agreement to arbitrate. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co., supra,* 388 U.S. at 406, 87 S.Ct. at 1807.

**11.** Although defendants argue that the CFTC regulations are controlling, they also assert that the foreign exchange transactions were not commodity transactions within the purview of the CEA.

**12.** *See* Defendants' Memorandum in Opposition at 19–21; Supplemental Reply Memorandum of the Plaintiff and the Counterclaim Defendants at 5 (filed Oct. 14, 1983).

*& Smith, supra,* 622 F.2d at 228.[13] The purpose of the August 15, 1983 CFTC regulations are designed to "encourage the use of arbitration as a means of dispute resolution by participants in the commodity futures and options markets." 48 Fed.Reg. 22,136 (May 18, 1983). Thus, because the new regulations are designed to supplement existing rights rather than remedy existing hardships, the Court declines to give them retroactive effect. *See Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); *see also Arkoosh v. Dean Witter & Co.,* 571 F.2d 437, 438–39 (6th Cir.1978) (no retroactive effect to November 29, 1976 CFTC amendments because untimely assertion of rights resulted in manifest injustice); *Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 567 F.2d at 1181 (Meskill, J., dissenting) (CFTC *amicus curiae* brief states November 29, 1976 CFTC amendments were not intended to extend to pre-existing arbitration agreements).

### August 8, 1983 Notice

Relying on MLC's August 8, 1983 notice that existing arbitration agreements "will be null and void as of August 15, 1983," defendants assert that plaintiff waived its right to seek arbitration on the disputed transactions. Defendants contend that the MLC announcement and their response terminate rights pursuant to the arbitration agreement, including rights vested prior to the announcement. For the reasons set forth below, the Court rejects this contention.

Citing *Casey v. Kastel,* 237 N.Y. 305, 312, 142 N.E. 671, 673 (1924) and *Zogby v. State,* 53 Misc.2d 740, 743, 279 N.Y.S.2d 665, 668 (N.Y.Ct.Cl.1967), defendants maintain that the generally accepted definition of "null and void" is void *ab initio.* The interpretation of "null and void" in these cases was narrowly construed and both courts ruled that the term "null and void" is susceptible to a "more limited meaning" than void *ab initio. See Matter of New York & Long Island Bridge Co. v. Smith,* 148 N.Y. 540, 547, 42 N.E. 1088, 1090 (1895); *see also Ewell v. Daggs,* 108 U.S. 143, 148–49, 2 S.Ct. 408, 411–12, 27 L.Ed. 682 (1883) ("null and void" can give rise to antecedent rights and obligations).

■■■ Plaintiff's contention that the "null and void" provision applies solely to disputes arising after August 15, 1983 is supported by the facts and circumstances of this action. The language of the notice must be construed in light of reasonable business practices designed to preserve "sanity of end and aim." *Outlet Embroidery Co. v. Derwent Mills,* 254 N.Y. 179, 183, 172 N.E. 462, 463 (1930). Because MLC intended to retain its option to arbitrate against Richal,[14] the Court interprets the notice as preserving MLC's antecedent rights. *See Oil Trading Associates, Inc. v. Texas City Refining, Inc.,* 201 F.Supp. 846, 849 (S.D.N.Y.1962); *Brown v. McGraw-Hill Book Co.,* 25 A.D.2d 317, 320, 269

---

**13.** Retroactive effect was mandated for November 29, 1976 CFTC amendments designed to assure that pre-dispute arbitration agreements were voluntarily entered into and were not preconditions to doing business with commodities trading firms. *See Ames v. Merrill Lynch, Pierce, Fenner & Smith,* 567 F.2d 1174, 1178 (2d Cir.1977). These amendments were "protections" against involuntary contractual obligations. *Id.* at 1179; *see Curran v. Merrill Lynch, Pierce, Fenner & Smith,* 622 F.2d 216, 228 (6th Cir.1980), *aff'd,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

**14.** "Contractual obligations are fixed solely by the parties, and the language of a business contract must be construed in the light of what a businessman would reasonably expect to give or receive, to perform or suffer, under its terms."

*Shirai v. Blum,* 239 N.Y. 172, 179, 146 N.E. 194, 196 (1924). Plaintiffs had three weeks to comply with a July 22, 1983 Commodities Futures Trading Commission no-action letter requiring brokerage firms to inform each customer through uniform notices about the amended regulations. MLC was forced to notify thousands of worldwide customers and was unable to identify and send separate letters to those customers involved in arbitration proceedings. *See* Declaration of Don L. Horwitz, ¶¶ 6–8 (filed Sept. 27, 1983). Furthermore, statements of rescission made under conditions of haste or stress must be carefully scrutinized. *See S & L Paving Corp. v. MacMurray Tractor, Inc.,* 61 Misc.2d 90, 95, 304 N.Y.S.2d 652, 659 (N.Y.Sup. Ct.1969).

N.Y.S.2d 35, 38 (1st Dep't 1966), *aff'd*, 20 N.Y.2d 826, 285 N.Y.S.2d 72, 231 N.E.2d 768 (1967). Moreover, in view of the "overriding federal policy honoring arbitration [dictating that waiver] is not to be lightly inferred," *Carcich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir.1968); *see Southland Corp. v. Keating*, —— U.S. ——, ——, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984), the Court finds that the original July 26, 1982 arbitration agreement remains in effect. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 *reh'g denied*, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974); *China Union Lines, Ltd. v. American Marine Underwriters, Inc.*, 458 F.Supp. 132, 135 (S.D.N.Y.1978).[15]

### Alafouzos

 The remaining question is whether Alafouzos, as guarantor of Richal, must participate in the arbitration.[16] It is clear that nonsignatories to a contract containing an arbitration clause may be deemed parties thereto, through ordinary contract principles, for purposes of the Act. *See Interbras Cayman Co. v. Orient Victory Shipping Co.*, 663 F.2d 4, 7 (2d Cir.1981); *McAllister Brothers, Inc. v. A & S Transportation Co.*, 621 F.2d 519, 523–24 (2d Cir.1980). In construing the scope of a guarantee, the Second Circuit has stated:

> The determination of whether a guarantor is bound by an arbitration clause contained in the original contract necessarily turns on the language chosen by the parties in the guaranty. We are aided in our construction of the language here by prior decisions which make clear that where an arbitration clause is applicable by its own terms to all disputes and is not limited to those arising between the [contract signatories], the agreement to arbitrate binds "not only the original parties, but also all those who subsequently consent to be bound by [the terms of the contract]."

*Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.*, 527 F.2d 966, 973 (2d Cir.1975), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976) (quoting *Lowry & Co. v. S.S. Le Moyne D'Iberville*, 253 F.Supp. 396, 398 (S.D.N.Y.1966), *aff'd*, 372 F.2d 123 (2d Cir.1967)).

 In the instant dispute, the arbitration agreement covers "any controversy arising out of or relating to [Alafouzos'] account" and the Continuing Guaranty states unequivocally that Alafouzos guarantees any indebtedness that Richal may incur "in accordance with any special agreements" between MLC and Richal.[17]

---

**15.** Defendants' reliance on the New York Uniform Commercial Code ["N.Y.U.C.C."] (McKinney 1964) for their contentions is not supported by applicable statute. N.Y.U.C.C. § 2–720 provides that: "Unless the contrary intention clearly appears, expressions of 'cancellation' or 'rescission' of the contract or the like shall not be construed as a renunciation or discharge of any claim in damages for an antecedent breach." Moreover, the official comment to N.Y.U.C.C. § 2–720 states that the section is "designed to safeguard a person holding a right of action from any unintentional loss of rights by the ill-advised use" of ambiguous business terms. The official comment further states that "[o]nce a party's rights have accrued they are not to be lightly impaired by concessions made in business decency and without intention to forego them." *Cf. Marlene Industries Corp. v. Carnac Textiles, Inc.*, 45 N.Y.2d 327, 333–34, 380 N.E.2d 239, 242, 408 N.Y.S.2d 410, 413 (1978) (waiver of litigation rights).

**16.** The Commodity Account Agreement, the Continuing Guaranty and the arbitration agreement were all signed by Aristidis I. Alafouzos ["Alafouzos"] on behalf of Richal Shipping Corp. ["Richal"] or in his individual capacity. Handwritten notations underneath the signatures indicating that the documents were signed by "I. Alafouzos" are incorrect. *See* Defendants' Memorandum in Opposition at 31.

**17.** Defendants rely on *Taiwan Navigation Co. v. Seven Seas Merchant Corp.*, 172 F.Supp. 721 (S.D.N.Y.1959), for the contention that no obligation to arbitrate was created by the Continuing Guaranty. *See* Defendants' Memorandum in Opposition at 29. The Court notes that Alafouzos waived notice of "any obligations incurred under [the Continuing Guaranty]." Moreover, in *Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.*, 527 F.2d 966, 973–74 (2d Cir.1975), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976), the Second Circuit held that a nonsignatory guarantor was bound by an arbitration agreement and distinguished *Taiwan Navigation Co. v. Seven Seas Merchant Corp., supra*, because (1) the arbitra-

The arbitration agreement is sufficiently broad to bind Alafouzos and the Court concludes that the references in the Continuing Guaranty explicitly adopt the conditions of the Commodity Account Agreement, including the arbitration agreement, all signed by Alafouzos. *See Compania de Espanola de Petroleos, S.A. v. Nereus Shipping, S.A., supra,* 527 F.2d at 973–74; *Antco Shipping Co. v. Sidermar, S.p.A.,* 417 F.Supp. 207, 217–18 (S.D.N.Y.1976), *aff'd,* 553 F.2d 93 (2d Cir.1977); *Midland Tar Distillers, Inc. v. M/T LOTOS,* 362 F.Supp. 1311, 1313 (S.D.N.Y.1973); *Lowry & Co. v. S.S. Le Moyne D'Iberville, supra,* 253 F.Supp. at 398–99.[18]

*Counterclaims/Discovery*

Because the third-party complaint is clearly within the ambit of the arbitration agreement and should be resolved in the arbitration proceeding, the Court denies the counterclaim dismissal motion without prejudice. *See Schulman Investment Co. v. Olin Corp.,* 458 F.Supp. 186, 188 (S.D.N.Y. 1978). The motion for a protective order is denied without prejudice. 9 U.S.C. § 7; *see Commercial Solvents Corp. v. Louisiana Liquid Fertilizer Co.,* 20 F.R.D. 359, 361 (S.D.N.Y.1957).

CONCLUSION

Plaintiff's and third-party defendants' motion for a stay of this action pending arbitration and for an order compelling Richal and Alafouzos to proceed to arbitration are granted. 9 U.S.C. §§ 3, 4.

Plaintiff's and third-party defendants' motion to dismiss counterclaims is denied

without prejudice. Fed.R.Civ.P. 12(b)(2), (6).

MLC is directed to send a letter to Richal within five (5) days of the date of this Memorandum and Order describing the available options for arbitration pursuant to the July 26, 1982 arbitration agreement. This letter may incorporate the increased options available under the August 15, 1983 CFTC amendments.

The Clerk of the Court is directed to prepare and enter Judgment dismissing the action without prejudice.

SO ORDERED.

---

tion clause was limited to disputes between "Owners and Charterers"; and (2) the guaranty was limited strictly to "performance". In the instant dispute, the arbitration agreement applies to all controversies relating to the 075 Account and the Continuing Guaranty secures Richal's indebtedness in accordance with all agreements.

18. In determining who is bound by an arbitration agreement, federal courts look to state contract principles. *See McAllister Brothers, Inc. v. A & S Transportation Co.,* 621 F.2d 519, 524 (2d Cir.1980); *Farkar Co. v. R.A. Hanson DISC., Ltd.,* 441 F.Supp. 841, 845 (S.D.N.Y.1977), *rev'd*

*on other grounds,* 583 F.2d 68 (2d Cir.1978); *Wells Fargo Bank v. London Steam-Ship Owners' Mutual Insurance Association, Ltd.,* 408 F.Supp. 626, 629 (S.D.N.Y.1976). The Court's determination that Alafouzos is bound by the arbitration agreement is supported by New York law. *See Madawick Construction Co. v. Travelers Insurance Co.,* 307 N.Y. 111, 118, 120 N.E.2d 520, 527 (1954); *Calvin Klein Co. v. Minnetonka, Inc.,* 88 A.D.2d 503, 504, 449 N.Y.S.2d 729, 731 (1st Dep't 1982); *National Recreational Products, Inc. v. Gans,* 46 A.D.2d 618, 619, 359 N.Y.S.2d 803, 804 (1st Dep't 1974).