Vincent A. DeIorio, J.
These claims, timely filed, are for the appropriation in fee of claimants’ land pursuant to section 30 of the Highway Law. On July 3, 1969, the State (acting for the Power Authority) appropriated 21.25 acres of land (Map No. 3, Parcel No. 40). Thereafter and on February 26, 1970, the State appropriated an additional 130.66 acres (situated adjacent to the area previously taken) of claimants’ land (Map No. 12, Parcel No. 95).
The valuation approach utilized by claimants raises a threshold issue which must be analyzed and resolved before the court can proceed to consider damages suffered by the takings.
Specifically, the appraiser considered each of the appropriations herein separately. He was of the view that the second taking was not related to the first, i.e., that the second appropriation was not within the "original scope of the project” as contemplated by the Power Authority of the State of New York (hereinafter referred to interchangeably as the "Authority” or "State”). Therefore, he considered the remainder after the first taking enhanced by the presence of the adjacent public improvement to the extent of altering the highest and best use of the lands east of the highway and the frontage area west of the highway from an operating dairy farm with enhancement for the historical Manor House to commercial lands improved by the Manor House with an excellent view of the power pool and pumping station.
This premise and his approach considerably influenced his appraisal of consequential damages resulting from the first *332 appropriation and as well, the value of the remainder lands and improvements appropriated by the second taking.
When lands are appropriated and a public improvement is erected thereon, the market value of adjacent lands may increase due to the proximity of that improvement. If such adjacent lands are subsequently appropriated, the owner is entitled to be compensated for the market value thereof as enhanced by the proximity of the improvement. If, however, the adjacent lands were, from the beginning, within the scope of the public improvement project, the owner thereof is not entitled to any enhancement value simply because his property was appropriated subsequent to the taking of neighboring lands. (United States v Miller, 317 US 369, 376-377.)
This rule has been followed in New York. (See Andrews v State of New York, 19 Misc 2d 217, affd 11 AD2d 599, affd 9 NY2d 606; Sparks v State of New York, 39 AD2d 822.)
As stated by the United States Supreme Court in Miller (supra, p 377): "The question then is whether the respondents’ lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government’s activities.”
The precise issue presented herein, therefore, is whether or not the second appropriation of 130,66 acres by the filing of Map No. 12, Parcel No. 95 was probably within the scope of the Blenheim-Gilboa Pumped Storage Power Project when the State became committed to the project.
This critical issue has been treated as a question of law for the court to decide, according to United States v Reynolds (397 US 14, 20-21) and Wardy v United States (402 F2d 762, 763). The paucity of reported decisions in New York is of some partial assistance in delineating those factors which should be considered. Therefore, this court has additionally reviewed other Federal judicial authority on the theory of enhancement treating the so-called Miller rule which has been accepted as the rule to follow in the State of New York. (See Andrews v *333 State of New York, supra; Sparks v State of New York, supra; Fitzgerald v State of New York, 10 Misc 2d 1046, affd 9 AD2d 486; Matter of City of New York (Lincoln Sq.), 22 Misc 2d 619.)
The following is a delineation and discussion of those factors to be considered in application of the Miller rule.
First, the fact that a claimant did not know that his land would be included in the public improvement project does not support a finding that his lands were not probably within the scope of the project. (Fitzgerald v State of New York, 9 AD2d 486, 487, supra.) However, proof that a claimant or the general public could or did have such knowledge would tend to negate any enhancement and is a factor that should be considered. (See Andrews v State of New York, 19 Misc 2d 217, 223, supra.)
Second, it is not necessary that the project be constructed before such enhancement becomes available. The Authority urges that there can be no enhancement unless the adjacent public improvement has been actually erected upon the land (citing Matter of City of New York [Lincoln Sq.], supra and 19 NY Jur, Eminent Domain, § 149). The cited authorities are, in this court’s view, in error. The basis for this statement in the Lincoln Square decision was a rather literal and narrow interpretation of language set forth in the Miller decision (p 376). Such an interpretation has not been followed by the Federal courts in applying the Miller rule. (See United States v 172.80 Acres of Land, etc., 350 F2d 957, 959; United States v 244.48 Acres of Land, etc., 251 F Supp 871, 873.) Further, this interpretation does not square with other judicial authorities in New York which have permitted such enhancement consideration where the adjacent project is in the process of development. (See Sparks v State of New York, 39 AD2d 822; Killip Laundering Co. v State of New York, 32 AD2d 579, 580.)
Third, a distinction must be kept in mind between the time of "onset” of such project enhancement as opposed to the time of determination of its "value”. This court is of the view that the correct rule was stated by District Judge Willson in United States v 244.48 Acres of Land, etc. (supra, p 873) as follows:
"It seems to me that the answer to this proposition is that any enhancement due to the proximity of this particular land to the project occurred when the original project plans were announced, but the enhancement value in terms of money *334 may not have been generally realized by the public and even the landowners until work on the Reservoir had commenced and attention was drawn to the location in which the instant land was left with relation to the dam.”
In other words, an enhancement occurs when the project plans are first announced but the value thereof cannot be determined until there is some public (market) awareness of the relationship of the subject land to the project. As discussed, this market awareness and reaction could occur prior to any erection of the project.
Fourth, a description of subject lands in the original plans for the project is not required (United States v Crance, 341 F2d 161), but the presence or absence of such contemplated takings at an early planning stage are relevant factors to be considered (United States v 172.80 Acres of Land, etc., supra; United States v 327 Acres of Land, etc., 320 F Supp 844. See, also, 14 ALR Fed 806).
Fifth, the lapse of time between the original and the supplemental takings is a factor to be considered. (Blas v United States, 261 F2d 636; United States v 327 Acres of Land, etc., supra.)
Sixth, the physical location of the subject lands to the project may be a significant factor. (United States v Crance, supra; United States v 327 Acres of Land, etc., supra.)
Finally, other factors such as a demonstrated change in government policy or the showing that a particular need was obvious from the beginning may, in an appropriate case, be relevant. (See United States v 172.80 Acres of Land, etc., supra; Roper Lbr. Co. v United States, 150 F2d 329; United States v 327 Acres of Land, etc., supra.)
With these pertinent factors in mind, the court now proceeds to an analysis of the factual portrayal proffered by the record herein.
Pursuant to legislative enactment (L 1968, ch 294), the Power Authority conceived the notion of the Blenheim-Gilboa Pumped Storage Power Project. After investigation, studies and research, an application for a license for this project was forwarded to the Federal Power Commission on August 15, 1968. The license was issued on June 6, 1969. On June 16, 1969, the Power Authority accepted the license and also authorized acquisition of the lands required for the upper and lower reservoirs. That portion of claimants’ lands embraced by *335 the first taking was included in the perimeter map, as lands required for the lower reservoir. On June 27, 1969, the Authority entered into a major contract for construction of the project.
The court notes that a "Detail Map of Project Area” submitted as Exhibit K and appended to the license application as further defined and explained by Robert W. Graves, presently the Director of Real Estate for the Authority, in a pretrial deposition delineates the approximate project boundary then contemplated. As indicated by Mr. Graves, the approximate project boundary encompassed a portion of claimants’ land fronting on the east side of Route 30 and not embraced within the first taking of 21.25 acres. Mr. Graves further indicated that the total area of claimants’ land included within the approximate project boundary amounted to about 60 acres. Therefore, there were 39+ more acres delineated within the original Detail Map than were actually taken in the first appropriation.
It further appears that the lands fronting on Route 30 and not embraced by the first taking were originally contemplated as recreational lands to be utilized for a visitors’ information center and ancillary facilities. As a result of negotiations with the Department of Conservation, a revised recreational plan was submitted to the Federal Power Commission on June 29, 1970. The revised plan included all of claimants’ land east of Route 30 within the project boundary.*
This revision involved, in part, an enlargement of Mine Kill State Park as originally proposed, relocation of the visitors’ information center and expansion of the area for wildlife habitat. Essentially, this "enlargement” took in the area of land east of Route 30 between the originally contemplated location of the visitors’ information center and Mine Kill State Park.
Mindful that 39+ of the 130.66 acres embraced by the second taking were within the original approximate boundary line of the project, the pertinent issue is whether the other 91 acres+ were probably within the scope of the project.
A review and consideration of the above-suggested relevant factors on this issue follows.
*336 As to claimants’ or the public’s awareness of the scope of the project, the only pertinent evidence is testimony by Mr. Mattice to the effect that he never spoke with anyone prior to the taking, and the deposition of Mr. Graves, wherein it is indicated that negotiations were had on January 31, 1969 (prior to the first appropriation) with Mr. Mattice relative to acquisition of all claimants’ land east of Route 30. As well, a memorandum from William S. Chapin, dated December 23, 1969, clearly implies that some discussions were had with Mr. Mattice concerning the Authority’s acquisition of all the land east of Route 30.
Equally significant is the fact that the trustees of the Authority met on February 16, 1970 and adopted a resolution authorizing the second appropriation with full map and parcel description obviously theretofore prepared with improvements, description and estimated value also obviously theretofore prepared.
The court is of the view that, prior to December of 1969 (and hence for some time prior to the second taking), Mr. Mattice was aware that the Authority desired acquisition of all of claimants’ land east of Route 30. However, the record evidence is insufficient to permit a conclusion as to whether or not such an awareness occurred prior to July 3, 1969 (the date of the first taking) or June 16, 1969 (the apparent date the Authority became "committed” to the project).
The lapse of time between these takings (about 8 months) is not considered significant enough to support claimants’ contention herein. Despite the time interval, the project had not progressed to any substantial extent beyond the initial land acquisition. Obviously, the discussions, negotiations, processing, map and description and value estimate preparations for the second appropriation were on-going during this time interval. Under these circumstances, the project was still in the early planning stages and further land acquisitions (including subject) were contemplated. This is not a situation where the subject adjacent lands are acquired several months after acquisition of all lands contemplated by the project.
Another critical factor is the physical location of the area embraced by the second taking. A portion of the area (39+ acres) was clearly contemplated for recreational use within the original project application. The remaining 91+ acres were not only adjacent to the reservoir perimeter but also *337 adjacent to a recreational use area and located between that area and another further to the south (Mine Kill State Park).
As stated by the Federal Court of Appeals in United States v Crance (341 F2d 161, 165, supra): "The significant factor here is that this project contemplated recreational areas from its very inception and certainly property lying beyond a perimeter of the reservoir would probably be incorporated for recreational purposes if the land acquired for the reservoir alone was not also sufficient for recreational utilization. Since the Crance property abutted the reservoir line, it was within the sphere of probable acquisition for recreational use.”
In the instant situation, not only was the parcel embraced by the second taking ideally suited for Authority purposes, but a portion thereof (39+ acres) was originally included and contemplated for that purpose.
Counsel for the claimants seeks to distinguish the Crance decision from the instant situation on the basis that the project maps (contained in the license application and supporting material) did definitely delineate the project boundaries.
The court’s response to this is threefold:
First, the maps themselves indicate the term, "approximate boundary”.
Second, Exhibit R of the license application states:
"Applicant proposes that all project waters and adjacent lands, with the exception of those areas that are considered unsafe for public use, be available for public outdoor recreational use.” The map attached thereto designates the boundary as "recommended limit of acquisition”. It further appears that Appendix R-l and Appendix S-l which describe in detail the recreational and fish and wildlife plans respectively, were not intended as final documents and were still subject to recommendations from other concerned agencies. Indeed, Appendix S-l was not approved, and the license was granted to the Authority conditional upon submission of an approved fish and wildlife report.
Third, although appropriation Map No. 3, Parcel No. 40 (which applies to the first taking) does not include any portion of the frontage lands east of Route 30 or any of subject’s improvements, such absence is easily explained. Perimeter Map No. 3 (and No. 2 as well) embraced those lands that had to be acquired for purposes of the upper and lower reservoirs. (See Resolution of Power Authority, Feb. 16, 1970.) It appears *338 that other maps were subsequently filed for lands required for ancillary purposes, such as recreational use (the contemplated use of claimants’ frontage lands east of Route 30). In other words, appropriation Map No. 3, Parcel No. 40 was not drawn to describe the final and total project boundary and clearly differed from the contemplated project boundaries as discussed above. Indeed, this discrepancy in boundaries should have alerted any prospective purchaser of claimants’ land fronting on the east side of Route 30 that additional and further appropriations were contemplated.
Therefore, the court is of the view that the project boundary delineations as described in the various maps of the application were not intended or considered to be "final” by either the condemning Authority or the Federal Power Commission.
Claimants have also attempted to demonstrate that the scope of the project was subsequently enlarged beyond original contemplation when the revised recreational use plan was submitted to the Federal Power Commission in 1970. However, it should be emphasized that the original boundaries and intendments were not final. At the time Appendix R-l and Appendix S-l were submitted, the Power Authority was still awaiting recommendations and approvals from other agencies.
In any event, the mere fact that there might have been an enlargement so as to include subject property would not be of consequence if the area was probably within the scope from the beginning. "The rule does not require a showing that the land ultimately taken was actually specified in the original plans for the project. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public use.” (United States v Reynolds, 397 US 14, 21, supra.)
In view of all of the foregoing, the court concludes and finds that of the 130.66 acres taken in the second appropriation, a portion (39+ acres) of the land therein embraced was actually within the original approximated boundaries of the project; that the remainder (91+ acres) was probably within the scope of the project from the beginning and that, at the very least, it became evident during the early planning or construction that this land would be needed for the public use. Therefore, the theory of project enhancement value is not available or applicable in this case.
Claimants’ counsel has submitted two memoranda of law, both of which have been of considerable assistance to the *339 court in resolving this issue. Though the court has reached a contrary conclusion, we would be remiss in not acknowledging appreciation of counsel’s diligent efforts of persuasion on this crucial legal issue. There is one additional point raised by counsel which deserves some comment.
Counsel contends that the scope of a project turns directly upon the purpose it intends to achieve and that, in this instance, the acquisition of claimants’ lands under the second taking was beyond the defined project recreational needs of the Authority and was, in effect, a "banking” of recreational lands for, and upon the urging of, other State agencies.
There are some flaws in this argument that diminish its vitality.
First, a portion of the lands embraced by the second taking was actually within the defined project recreational needs of the Power Authority. This fact has not been controverted in the least by claimants.
Second, as with many public improvement projects in recent times, proper consideration must be given to environmental and recreational needs. Hence, the development of recreational areas adjacent to power projects of this sort are now commonplace and are considered an integral part of the entire scope of the project. The mere fact that certain recreational areas are to be operated and maintained by another agency with expertise in the management of recreational areas does not, in this court’s view, mean that the area no longer has a necessary and integral relationship to the power project.
Third, the Authority has a legitimate concern with respect to lands abutting the perimeter of a reservoir and power facilities. The need to control access to and protect its facilities and, as well, the development of lands abutting its reservoir and facilities is a legitimate public purpose. (See, in this regard, Cuglar v Power Auth. of State of N.Y. 4 Misc 2d 879, affd 4 AD2d 801, affd 3 NY2d 1006.) The legitimacy of this concern in the claims at bar was emphasized and reinforced upon the court’s viewing of subject, the project and adjacent lands.
The suggestion therefore that recreational areas are to be managed by other State agencies does not detract from the fact that such areas are within the purposes and scope of the power project.
In this sense, the rationale of the court’s decision in Zogby v *340 State of New York (53 Misc 2d 740) is not pertinent to the instant factual situation. In Zogby, the court (Lengyel, J.) indicated that the thrust of the appropriation was twofold: to obtain land for highway purposes and to obtain lands not close to the highway for park purposes of the County of Onondaga. In the instant situation, the lands embraced by the second taking abut the reservoir perimeter lands and the contemplated recreational use is related to the over-all scope of the project.
Counsel for the claimants is correct in his analysis of the decision in Sparks v State of New York (39 AD2d 822, supra) to the effect that scope of the project does not turn upon the condemning authority or authorities involved. However, Sparks is distinguishable from the present case in that herein, the adjacent recreational lands are related to the power project and, as found by the court herein, were probably within the scope of the project during the early planning stages. The court in Sparks found that the adjacent lands in that situation were not contemplated for use in connection with the Federal project. Further, the court notes that the State appropriation occurred "well after” the Federal project was under way, which is not the case herein. (See Sparks v State of New York, 48 AD2d 236, 238.)
One final point made herein deals with the oft-reiterated point that the Authority had not contemplated use for subject’s improvements until some time in 1973. Suffice it to say that the lands embraced by the second taking were probably within the scope of the project during the early stages of planning. There mere suggestion that the Authority had not contemplated a precise use for the improvements does not detract from this finding. A particular use for a particular building could undergo several changes in decision (or it could be demolished) without affecting a public need for the land in fee.
[This Decision has been edited by the court for publication purposes.]

 See, Exhibit R, Sheet 2, of "Notice of Application for Approval of Revised Exhibit R (Recreational Use Plan) for Project.” This revision included the 39+ acres previously delineated in the original Detail Map (Exhibit K) plus the remaining 91+ acres of claimants’ property situate on the easterly side of Route 30.